## STATE OF HAWAII, ex rel., RONALD Y. AMEMIYA, Attorney General, Plaintiff, v. EILEEN R. ANDERSON, Director of Finance, State of Hawaii, Defendant

NO. 5826

JANUARY 23, 1976

RICHARDSON, C.J., KOBAYASHI, OGATA AND
MENOR, JJ., AND RETIRED JUSTICE LEWIS
IN PLACE OF KIDWELL, J., RECUSED

OPINION OF THE COURT BY KOBAYASHI, J.

This is an action for declaratory judgment brought by State Attorney General, Ronald Y. Amemiya, as relator for the State of Hawaii (State or Attorney General), against Eileen R. Anderson, Director of Finance of the State (Director). The question submitted to this court for its resolution is whether or not the Director may issue, sell and deliver twenty million dollars ($20,000,000) worth of anti-pollution revenue bonds, authorized by Act 161, Session Laws of Hawaii 1973 (Act 161), and enter into a "project agreement"[1] with a private, profit-making utility company to finance a government-mandated anti-pollution project with the proceeds of the bond sales. The answer to the question depends upon whether the revenue bonds are chargeable against the State debt limitation. It is clear that, under Act 161, the intent of the legislature is that the bonds shall not be issued if they are chargeable against the debt limitation.[2]

Since the case is being submitted on an agreed statement of facts, this court has original jurisdiction pursuant to section 4, Act 161, and HRS § 39-96. For the reasons stated below, we hold that the revenue bonds are chargeable against the State debt limitation.

---

[1] "Project agreement" is defined in Section 39-125(4) of Act 161 as:
"any lease, sub-lease, conditional sale agreement, installment sale agreement, lending arrangement or other contract or agreement, or combination thereof, entered into under this part by the department for the financing from the proceeds of revenue bonds of an anti-pollution project."

[2] Standing Committee Report No. 755 on S. B. No. 377, House Journal, Regular Session of 1973, reads in part at 1129:
It is your Committee's specific intent that if the revenue bonds can be so counted against the State's debt limit, the provisions of this Act shall not be utilized.

568

STATEMENT OF THE CASE

Hawaiian Electric Company, Inc. (Hawaiian Electric or Company) is a private corporation that has provided public utility electric service on the island of Oahu since the 1890s. Hawaiian Electric owns and operates a generating station at Kahe, Oahu, which fronts on the ocean and uses ocean water to cool the condensers of its steam turbines. The ocean water is presently being drawn through an intake basin located at the shoreline, passed through the condensers, and discharged through tunnels which terminate at the shoreline. In the process, the temperature of the water passing through the cooling system is raised approximately ten (10) degrees Fahrenheit, thus presenting a thermal pollution problem for the offshore waters.

In order to meet both federal and state anti-thermal pollution requirements, Hawaiian Electric planned to install a new cooling system which would discharge the heated water approximately one thousand five hundred (1,500) feet offshore rather than at the shoreline as it is presently done. The cost of constructing and operating the proposed system (Kahe Project) is estimated at around twenty-million dollars ($20,000,000).

To facilitate the financing of the Kahe Project,[3] Hawaiian Electric proposed that Act 161 be used and that a project agreement be entered into by Hawaiian Electric and the Department of Budget and Finance (Department). Section 39-126 of Act 161 authorizes the Department, with the approval of the Governor, to issue revenue bonds in such amounts as may be necessary to cover the cost of an anti-pollution project. The terms of the project agreement would unconditionally obligate Hawaiian Electric to pay to the Department during the term of the agreement such rates and charges in the form of rentals or installment sales payments

---

[3] By issuing revenue bonds through the State, marketability of the bonds is substantially increased and the interest expense is substantially reduced primarily because of the favorable tax treatment such anti-pollution revenue bonds receive pursuant to § 103(c)(4)(F) of the Internal Revenue Code (26 U.S.C.A. § 103).

or otherwise, sufficient to: (a) pay the principal and interest on the revenue bonds issued including any premiums payable upon any required redemption; (b) establish or maintain such reserve, if any, as may be required by the instrument authorizing or securing the revenue bonds; (c) pay the fees and expenses of the paying agents and trustees for such revenue bonds; and (d) pay the expenses incurred by the Department in administering such bonds or in carrying out the Kahe Project or the project agreement.

The contemplated project agreement further provides:

(a) the Department will not operate, maintain or repair the Kahe Project nor will it receive any moneys from the Company for the operation, maintenance or repair of the project;

(b) Kahe Project will be or become the property of the Company;

(c) one of the following alternative arrangements:

1. the Department would loan the proceeds from the sale of the pollution bonds to the Company which would use such funds to acquire the Kahe Project. The Company would issue its unsecured promissory note to the Department to evidence the loan;

2. the Department would initially acquire the Kahe Project with the proceeds from the sale of the pollution control bonds and then sell it to the Company under a conditional sale agreement, under which the Company would take title to the project and would be given exclusive possession and right of use of the project. The terms of the agreement require the Company to pay to the Department, among other costs, the principal and interest on the bonds;

3. there would be a lease of the project by the Company to the Department and a lease-back by the Department to the Company of the project. The terms of the lease-back are similar to the terms of the above conditional sale agreement.

The Attorney General contends:

(1) Act 161 violates Article VI, section 2 of the Hawaii Constitution in that it appropriates public money or public

property or uses the public credit for other than a public purpose;

(2) the Act 161 revenue bonds in question are chargeable against the State debt limit because they do not meet the requirements of Article VI, section 3, subparagraph (b) of the Hawaii Constitution;

(3) Act 161 violates Article III, section 1 of the Hawaii Constitution in that it contains unlawful delegations of power; and

(4) Act 161 violates Article I, section 4 of the Hawaii Constitution and section 1 of the Fourteenth Amendment to the United States Constitution (*i.e.* the due process and equal protection clauses) because of vagueness.

RELEVANT STATE CONSTITUTIONAL PROVISIONS AND STATUTES

The following are the relevant constitutional provisions and statutes:

Article VI, section 2 of the Hawaii Constitution reads:

No tax shall be levied or appropriation of public money or property made, nor shall the public credit be used, directly or indirectly, except for a public purpose. No grant shall be made in violation of Section 3 of Article I of this constitution.

Article VI, section 3(b) of the Hawaii Constitution reads:

In determining the total indebtedness of the State or funded debt of any political subdivision, the following shall be excluded:

. . . .

(b) Revenue bonds, authorized or issued, if the issuer thereof is obligated by law to impose rates and charges for the use and services of the public undertaking, improvement or system, or to impose a user tax, or to impose a combination of rates and charges and user tax, as the case may be, sufficient to pay the cost of operation, maintenance and repair of the public undertaking, improvement or system and the required payments of the principal of and interest on all revenue bonds issued for the public

undertaking, improvement or system, and if the issuer is obligated to deposit such revenues or tax or a combination of both into a special fund and to apply the same to such paymentts in the amount necessary therefor. For the purposes of this section a user tax shall mean a tax on goods or services or on the consumption thereof, the receipts of which are substantially derived from the consumption, use or sale of goods and services in the utilization of the functions or services furnished by the public undertaking, improvement or system.

Sections 1(a) and (b), Act 161, Session Laws of Hawaii 1973, reads:

Section 1. *Purpose.* (a) The purpose of this Act is to establish a means whereby anti-pollution measures can be financed through the issuance of revenue bonds by the department of budget and finance.

(b) The Legislature finds and declares that the health, safety and general welfare of the people of the State demand the control, reduction, abatement, treatment, elimination, disposal or prevention of air, water, sewage, visual and other pollution; that efforts are being made at the federal and state levels to accomplish such objectives, including at the federal level by the provisions of Section 103(c)(4), the U.S. Internal Revenue Code of 1954, as amended, exempting from federal taxation the interest on bonds issued by public bodies for certain anti-pollution facilities; that the foregoing anti-pollution measures by industry can be encouraged, initiated or financed with the assistance of the State through the issuance of revenue bonds; and that the promotion, initiating or financing of such anti-pollution measures through the assistance of the State is a public purpose.

Other pertinent sections of Act 161 are:

Section 39-125 *Definitions* reads in part:

(1) "Anti-pollution project" means any properties, or improvements or alterations to properties, designed, acquired, constructed, installed or modified, and certified as necessary or desirable by the Department of Health to

abate, control, reduce, treat, eliminate, dispose of or prevent air, water, thermal, radioactive or nuclear, visual, noise, aesthetic or other types of pollution, or for the supply or distribution of water, or for the collection, treatment or disposal of liquid or solid waste, or for any combination of the foregoing.

. . . .

(4) "Project agreement" means any lease, sublease, conditional sale agreement, installment sale agreement, lending arrangement or other contract or agreement, or combination thereof, entered into under this part by the department for the financing from the proceeds of revenue bonds of an anti-pollution project.

. . . .

Section 39-130 *Project agreement* reads in part:

Any project agreement entered into by the department shall contain provisions unconditionally obligating the project party:

(1) To pay to the department during the period or term of the project agreement, exclusive of any renewal or extension thereof and whether or not the anti-pollution project is used or occupied by the project party, such sum or sums in the form of rentals or installment sales payments or otherwise, at such time or times and in such amount or amounts that will be at least sufficient: (a) to pay the principal and interest on all revenue bonds issued for the anti-pollution project as and when the same become due, including any premium payable upon any required redemption of such bonds; (b) to establish or maintain such reserve, if any, as may be required by the instrument authorizing or securing the revenue bonds; (c) to pay the fees and expenses of the paying agents and trustees for such revenue bonds; and (d) to pay the expenses incurred by the department in administering such bonds or in carrying out such project or the project agreement.

(2) If title to or ownership of all or any part of the anti-pollution project shall be in the State or if the interest

of the department in the anti-pollution project shall be mortgaged, pledged or otherwise encumbered to secure the revenue bonds, then so long as such title or ownership shall be in the State or such mortgage, pledge or other encumbrance shall not be satisfied and discharged and released, to operate, maintain and repair the anti-pollution project or to pay to the department all costs incurred by the department in the operation, maintenance and repair of the project.

. . . .

Moneys received by the department pursuant to clause (d) of subsection (1) of this section shall not be, nor be deemed to be, revenues of the anti-pollution project and shall be paid into the general fund.

The department prior to entering into negotiations with respect to a project agreement or at any time during such negotiations shall require that as a condition to such negotiations or the continuation thereof it shall be reimbursed for any and all costs and expenses incurred by it even though a project agreement may not be entered into and may further require the deposit of moneys with the department as security for such reimbursement. Any amounts of such deposit in excess of the amount required to reimburse the department shall be returned by the department to the party which has made such deposit.

. . . .

Section 39-131 *Project revenue bonds* reads in part:

(1) The provisions of the first sentence of section 39-61 and the provisions of sections 39-62, 39-66 and 39-67 shall not be applicable.

(2) The department shall not have the power . . . to operate any anti-pollution project; . . . .

. . . .

(15) The obligation contained in the project agreement that the project party or other user of the anti-pollution project shall operate, maintain and repair at his expense the anti-pollution project which is the subject of

such agreement shall constitute compliance by the department with section 39-59(2), and none of the revenues and receipts derived by the department from such project shall be required to be applied to the purposes of section 39-60(2). Sections 39-60(4), 39-60(5) and 39-60(6) shall not be applicable to the revenues or receipts derived by the department from a project or under a project agreement.

Among the issues raised by the State, we believe the following are sufficient to dispose of the case:

1. Whether the purpose of Act 161 constitutes a public purpose as required in section 2, Article VI, Hawaii Constitution.

2. Whether the anti-pollution revenue bonds are excludable under section 3(b), Article VI, Hawaii Constitution, and thus, not chargeable against the State debt limitation.

### PUBLIC PURPOSE

Article VI, section 2 of the Hawaii Constitution states in relevant part: "No tax shall be levied . . . nor shall the public credit be used, directly or indirectly, except for a public purpose. . . ."

Determining what constitutes a public purpose is generally a question for the legislature to decide. *Anderson v. O'Brien*, 84 Wash.2d 64, 70, 524 P.2d 390, 394 (1974); *County of Alameda v. Janssen*, 16 Cal.2d 276, 281, 106 P.2d 11, 14, 130 A.L.R. 1141 (1940).

The legislature has declared in the purpose section of Act 161 that ". . . financing of such anti-pollution measures through the assistance of the State [through the issuance of revenue bonds] is a public purpose." Though the legislature's determination is not conclusive, it is given wide discretion and should not be voided by the courts unless it is manifestly wrong, *i.e.* the purpose involved is clearly a private one. *State ex rel. Farmers' Electric Cooperative, Inc. v. State Environmental Improvement Authority*, 518 S.W.2d 68 (Mo. 1975); *Hawaii Housing Authority v. Schnack*, 39 Haw. 543 (1952); *County of Alameda v. Janssen, supra.* However, "[w]hen a constitutional question is properly presented, it is the duty of the court to ascertain and declare the intent of the

framers of the Constitution and to reject any legislative act which is in conflict therewith. . . . The presumption, however, is in favor of constitutionality, and all doubts must be resolved in favor of the act." (Citations omitted.) *Mitchell v. North Carolina Industrial Development Financing Authority*, 273 N.C. 137, 144, 159 S.E.2d 745, 750 (1968).

A few jurisdictions have found acts similar to Act 161, which allowed financing or credit-lending arrangements by the state to private enterprises, for anti-pollution purposes, to be for other than public purposes despite the benevolent objectives of the acts.[4] The vast majority of jurisdictions, however, have found a public purpose in such acts.[5] Though the minority view presents persuasive reasoning,[6] we are of the opinion that the purpose of Act 161 constitutes a public purpose as required in section 2, Article VI.

Our opinion is premised upon several factors. First, during the 1968 State Constitutional Convention, the "public purpose" requirement of Article VI, section 2 was discussed by the Committee on Taxation and Finance in relation to the issuance of industrial development bonds.[7] The committee

---

[4] *E.g.* Stanley v. Dep't of Conservation and Dev., 284 N.C. 15, 199 S.E.2d 641 (1973).

[5] Opinions of the Justices, 359 Mass. 769, 268 N.E.2d 149 (1971); State ex rel. Farmers' Elec. Coop., Inc. v. State Env. Improvement Authority, 518 S.W.2d 68 (Mo. 1975).

[6] The Supreme Court of North Carolina in *Stanley* conceded that although environmental control was necessary and would indeed benefit the public generally, no apparent necessity for the State to finance the projects was shown. The same controls would result regardless of State financial assistance because the private firms were compelled by law to install the anti-pollution facilities. Therefore, any assistance the State rendered resulted in clearly private gains to the firms that do get State assistance. This gives those firms an unfair advantage over competitors who do not obtain similar financing but still must comply with governmental pollution regulations. On the other hand, if revenue bond financing were provided for all industrial polluters, Sharp, J., raised the specter of a flood on the bond market with a detrimental effect on the borrowing power of local governments for needed public improvements.

[7] Industrial development bonds are generally revenue bonds issued by a municipality to finance industrial plant construction or site purchases to encourage out-of-state companies to locate within that state.

implied that they considered the issuance of industrial bonds to be for a public purpose but decided against trying to define "public purpose" for fear of weakening the section.[8] Although anti-pollution bonds were not considered at that convention, we believe that the obvious purpose of Act 161, which is to aid in the control of pollution, is as important as, or more so than, the encouraging of industrial development. *See Industrial Development Authority of the County of Pinal v. Nelson,* 109 Ariz. 368, 374, 509 P.2d 705, 711 (1973). Second, virtually every State appropriation, financing or lending of credit results in some private benefit. The crucial factor, we believe, is the ultimate objective of the Act; the fact that incidental benefits accrue to private interests is immaterial. The objective of Act 161 is to help private enterprises install facilities designed to fight air, water, sewage and other pollution. As pointed out by the court in *Farmers' Electric, supra* at 72-73, "There will not be any increase in productive capacity or prolongation of the useful life of any private industrial facility." The sole purpose of such facilities is to protect the health, safety and general welfare of the people of Hawaii.

Third, as stated in a law review note on the public purpose doctrine and revenue bonds,[9] ". . . the exigencies of modern state government virtually compel the use of tax exempt financing as an incentive to publicly desirable activities in the private sector. . . . Just so, the public purpose doctrine need not be a static barrier to state activity in areas of consuming public importance."

---

[8] "We feel that industrial development bonds perhaps should be issued but they should only be issued if they are in fact for a public purpose and if they are in fact for a public purpose, *we have no doubt that the courts would hold that they were for a public purpose* and we feel that trying to spell any constitutional definition as to what we mean by public purpose would serve no end and in fact might weaken the section. . . ." (Emphasis added.) [II Proceedings of the Constitutional Convention of Hawaii of 1968 at 419.]

[9] Note, 52 N.C. L. Rev. 859, 875 (1974).

## CONSTRUCTION OF SECTION 3(b),
## ARTICLE VI, HAWAII CONSTITUTION

The Director of Finance of the State has conceded, in oral argument, that the anti-pollution revenue bonds can be issued only if the bonds fall within the exclusion provided in section 3(b).

Section 3(b) in relevant part reads:

Revenue bonds, authorized or issued, *if the issuer thereof is obligated by law to impose rates and charges for the use and services of the public undertaking, improvement or system . . . sufficient to pay the cost of operation, maintenance and repair of the public undertaking . . . and* the *required payments of the principal of and interest* on all revenue bonds issued for the public undertaking . . ., *and if the issuer is obligated to deposit such revenues . . . into a special fund* and to apply the same to such payments in the amount necessary therefor. . . . (Emphasis added.)

In construing the above section we adhere to the well established rule that "[i]n the construction of a constitutional provision . . . the words of the constitution are presumed to be used in their natural sense . . . 'unless the context furnishes some ground to control, qualify or enlarge [them].' " *Employees' Retirement System v. Budget Director Ho*, 44 Haw. 154, 159, 352 P.2d 861, 864-65 (1960).

In the process of construing section 3(b), a reference to vol. I, Proceedings of the Constitutional Convention of Hawaii of 1968, is relevant:

Standing Committee Report No. 52 of the 1968 Constitutional Convention recommended "a major redrafting" of section 3 of Article VI. Among the objectives were:

"3. To set limits that are sufficiently liberal as to permit adequate financing of future capital improvements but that at the same time provide assurance to investors that their investments in Hawaiian municipal securities are safe.

"4. To encourage the issuance of general obligation bonds rather than revenue bonds in order to make sub-

stantial savings in interest charges.

. . . .

"9. To remedy technical flaws in the revenue bond provision."
Proceedings of the Constitutional Convention of 1968, vol. I, p. 221.

Describing the provisions proposed to meet these objectives, the Committee said:

"1. That issued and outstanding general obligation debt for an undertaking supported by user revenues and/or user taxes shall be excluded from the debt limits to the extent that (after operating, maintenance and other related costs) net user revenues and/or user taxes make the undertaking self-sustaining so that all debt service charges will be met. . . .

"The purpose of this provision is to encourage the use of general obligation bonds instead of revenue bonds. . . .

"2. Revenue bonds shall not count against debt limits. . . . Revenue bonds are redefined to be issuable by the State and counties as well as by public corporations [and public enterprises] and can be securable by user taxes as well as user revenues . . . .

"We still want to provide for the issuance of revenue bonds since under some circumstances they may be desirable. However, our present Constitution limits revenue bonds to public corporations [and public enterprises] and specifies that they must be secured solely by the revenues of the undertaking. This was the basis of the Supreme Court Ho case[10] in 1960 . . . . We propose that the State and the counties (as well as public corporations [and public enterprises]) may issue revenue bonds and that user taxes as well as user revenues . . . can serve as security. . . ."
Proceedings of the Constitutional Convention of 1968, vol. I, p. 221, with addition of bracketed material pursuant to correction shown in Committee of the Whole

---

[10] Employees' Retirement System v. Ho, 44 Haw. 154, 159, 352 P.2d 861, 864-65 (1960).

Report No. 14, Proceedings p. 351, col. 2.

The draft accompanying the Standing Committee Report, Committee Proposal No.9, covered the present provisions (e), (f) and (g) of section 3, Article VI, Hawaii Constitution, having to do with excludable general obligation bonds, in a paragraph designated (g); and covered the definition of revenue bonds, presently found in the first paragraph of section 3, together with the present exclusion (b), in paragraphs designated (c), (d) and (e) and parts of (g). The latter specified:

"No revenue bonds, no revenue and user-tax bonds, and no user-tax bonds shall ever be excluded under clauses (c), (d), or (e) unless the issuer thereof is obligated by law to impose rates and charges for the use and services of the undertaking, or a combination of rates and charges and user-tax, or a user-tax, as the case may be, sufficient to pay the cost of operation, maintenance and repair of the undertaking or public improvement or system, as the case may be, and the principal of and interest on all such revenue bonds, revenue and user-tax bonds, or user-tax bonds, as the case may be, which are payable from such revenues or tax and is further required by law to deposit such revenues or tax into a special fund and apply the same to such payments in the amount necessary therefor. . . ."

Proceedings of the Constitutional Convention of 1968, vol. I, p. 227.

In the debates in the Committee of the Whole the chairman of the Standing Committee explained:

"We are, fourth, proposing to redefine revenue bonds both as to who can be the issuer and what can be security against the bond. Under the present Constitution, the only body that can issue a revenue bond is either a public corporation or a public enterprise, so that for example, the Highways Division of the State could not issue a revenue bond. Furthermore, under the present Constitution as interpreted by the supreme court, user taxes cannot serve as security for revenue bonds. The only security can be the revenues from fees and tariffs of that undertak-

ing. So while with one hand we are encouraging the issuance of general obligation bonds instead of revenue bonds, we realize that at times in the future it may be desirable to issue revenue bonds and we want to have a little greater freedom than exists in the present Constitution to issue them."

Proceedings of the Constitutional Convention of 1968, vol. II, pp. 383-84.

In our opinion the logical and natural meaning of section 3(b) is as follows:

1. The law must obligate the issuer of the bonds to:

a. impose rates and charges for the use and services of the undertaking, improvement or system, or a user tax, or a combination of rates and charges and user tax sufficient (1) to pay the cost of operation, maintenance and repair of the undertaking, improvement or system, and (2) to pay the required payments of the principal of and interest on the revenue bonds issued for the undertaking, improvement or system;

b. deposit such revenues or tax or a combination of both into a special fund, to apply the same to the above mentioned payments.

2. The issuer of the bonds must have sufficient proprietary control, for a period of time, over the undertaking, improvement or system to effectuate the above requirements imposed by law. Such control is necessary to provide the required security, in the form of revenues and/or tax, to make the above payments mentioned in subparagraph 1.a.

The requirement of section 39-129 of Act 161 that the department "shall first find and determine . . . that the person with whom it is proposed to enter into the project agreement is a responsible party" cannot be substituted for the requirement that the issuer maintain control.

We reach the above construction of section 3(b) not only because it expresses the natural sense of the provisions in the section, but also because the context of the section furnishes no "ground to control, qualify or enlarge" our construction. In addition, the quoted paragraphs of the journal of the Pro-

ceedings of the Constitutional Convention of Hawaii buttress our interpretation of section 3(b).

The Director, on the other hand, in her answering brief, at page 27, contends as follows:

> Under the proposed Project Agreement, there is no conceivable way the Department could become liable for expenses of operation, maintenance and repair. The project party is unconditionally obligated to pay principal and interest on the bonds and all expenses attendant upon their issuance. It is not necessary that the Department collect and sequester any amount to cover operation, maintenance and repair. But if the Constitution only requires funding of the necessary amount, then no funding is necessary. It is unreasonable to construe the Constitution as meaning that a revenue bond will not be treated as such unless unnecessary amounts be collected. *A far more reasonable interpretation, and one obviously shared by the Legislature, is that the issuer must collect whatever is necessary to assure that there is no residual financial burden on the issuer not covered by project revenue.* (Emphasis added.)

In our opinion the Director's reasoning is applicable to a revenue bond per se[11] and does not address itself to the question at hand: exclusion under section 3(b).

The Director has failed to direct her attention to the following salient points of section 3(b):

1. It provides an exclusion.

2. It sets forth conditions that must be strictly complied with before exclusion can be had.

We are of the opinion that sections 39-130 and 39-131 of Act 161 fail to require that the project agreement and the project revenue bonds meet the requirements of section 3(b) as construed herein. In addition, the terms of the contemplated project agreement clearly fail to meet said requirements.

---

[11] Section 3, Article VI of the Hawaii Constitution reads in part:
[T]he term "revenue bonds" means all bonds payable solely from and secured solely by the revenues, or user taxes, or any combination of both, of a public undertaking, improvement or system.

582

Thus, the revenue bonds herein are chargeable against the State debt limitation.

*Nobuki Kamida* and *Corinne K. Watanabe*, Deputy Attorneys General, for plaintiff.

*Charles M. Tonaki (Chuck, Wong* and *Tonaki* of counsel) and *Leo E. Sabatine (Wood, Dawson, Love* and *Sabatine* of counsel) for defendant.