936 P.2d 637

In re Earl I. **ANZAI**, in his capacity as Director of Finance, Department of Budget and Finance, State of Hawai'i.

No. 20264.

Supreme Court of Hawai'i.

April 9, 1997.

Diane Erickson, Deputy Attorney General, Honolulu, on the petition, for appellant.

Before KLEIN, A.C.J., LEVINSON, NAKAYAMA and RAMIL, JJ., and BURNS, Chief Judge, Intermediate Court of Appeals, in place of MOON, C.J., recused.

PER CURIAM.

In this original proceeding pursuant to Hawaii Revised Statutes (HRS) section 37D-9 (Supp.1996), Petitioner Earl I. Anzai, Director of Finance for the State of Hawai'i (Director), seeks an opinion regarding the following question:

Are financing agreements which meet the requirements of [1996 Hawai'i Session Laws] Act 119 (chapter 37D, Hawaii Revised Statutes), including a clause providing that payments are subject to appropriation and clauses providing that no liens or claims are created against the State and that no pledge of the full faith and credit of the State is made by the financing agree-

ments, excluded from the definition of "bond" within the meaning of Article VII, sections 12 and 13 of the Hawaii Constitution?

We hold that financing agreements entered into in accordance with HRS chapter 37–D [1] are not bonds as that term is used in article VII, section 12 of the Hawai'i Constitution, and thus will not count toward the debt ceiling of article VII, section 13. However, because we cannot anticipate any possible problem that might occur, this opinion is not intended as a blanket endorsement of all financing agreements that might be entered into by various state agencies.

## I. *Background*

During the 1996 legislative session, the legislature passed Act 119. Act 119, codified as HRS Chapter 37D, defines a financing agreement as:

> Any lease purchase agreement, installment sales agreement, loan agreement, or other agreement to finance the improvement, use or acquisition of real or personal property that is or will be owned or operated by the State or any state agency, or to refinance previously executed financing agreements including certificates of participation.

HRS § 37D–1 (Supp.1996).

Section 37D–2 limits the source of repayment to available funds,[2] and HRS § 37D–5 provides:

> Financing agreements shall:
>
> (1) Not be obligations for which the full faith and credit of the agency is pledged; and
>
> (2) Have no claim or lien on any revenues or other moneys of the agency except moneys appropriated or otherwise held in trust for such purpose.

Financing agreements entered into under this chapter shall not constitute "bonds" within the meaning of section 12 of article VII of the Constitution of the State. No holder or holders of any financing agreement entered into under this chapter shall have the right to compel any exercise of taxing power of the agency to pay such financing agreement or the interest thereon and no monies other than amounts appropriated or otherwise held in trust for such purpose shall be required to be applied to the payment thereof. *Each financing agreement issued under this chapter shall recite in substance that such agreement, including the interest component thereof, shall not be an obligation for which the full faith and credit of the agency is pledged, and that such financing agreement shall have no claim or lien on any revenues or other moneys of the agency except moneys appropriated or otherwise held in trust for such purpose.* (emphasis added).

The purpose of the statute is "to avoid jeopardizing the ratings on state bonds and to maintain the fiscal integrity of the State, by establishing procedures in the State budgeting process and other fiscal and legal oversight to monitor, coordinate, and control 'off-the-book' financings." 1996 Haw.Sess.L. Act 119, § 1 at 273.

The Director argues that if the financing agreements contain a nonappropriation clause and are not unconditional obligations of the State, the agreements: (1) are not "bonds" as defined by article VII, section 12; (2) will not be subject to the constitutional requirements applicable to "bonds"; and (3) will not be counted in the calculation of the debt limit. The Director has submitted blank draft forms for a lease agreement, an assignment agreement, and a trust agree-

---

**1.** In other words, financing agreements contemplated by chapter 37–D are agreements that (1) include a clause stating that payments are subject to appropriations by the legislature and (2) make clear that (a) no lien or claim is created against the State and (b) there is no pledge of the full faith and credit of the State.

**2.** "Available funds" means funds appropriated or otherwise made available, from time to time, by the legislature to pay amounts due under a financing agreement for the fiscal period in which the payments are due, together with any unexpended proceeds of the financing agreement, and any reserves or other amounts that have been deposited in trust to pay amounts due under the financing agreement. The legislature shall not be obligated to appropriate or otherwise make funds available. HRS § 37D–1 (Supp.1996).

ment as examples of the types of documents state agencies will use when drafting financing and related agreements.[3] The lease/purchase agreement contains a clause providing that rental payments are limited to available funds and that the payments are not construed as a debt. Based upon the language contained in the forms, language that will be in all financing agreements, the Director asks this court to conclude that financing agreements and related agreements developed in accordance with chapter 37D will not constitute "debt" as that term is used in the Hawai'i Constitution and will not be counted against the constitutional debt limit.

## II. *Jurisdiction*

Section 9 of HRS chapter 37D governs our review of questions regarding financing agreements. It provides:

The director of finance may petition the supreme court for an opinion as to the validity of any financing or related agreements entered into pursuant to the provisions of this chapter. The petition shall constitute a case for purposes of section 602–5, and the supreme court shall have exclusive and original jurisdiction to receive and determine the question presented in the petition, irrespective of an actual controversy or dispute regarding the agreement or its validity.

When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. *State v. Toyomura*, 80 Hawai'i 8, 18, 904 P.2d 893, 904 (1995) (citation and internal quotation marks omitted). A statute is ambiguous if it is capable of being understood by reasonably well-informed people in two or more different senses. *Id.*

Reading the statute as a whole, it is unclear whether the legislature intended to limit our review to financing "agreements entered into" by agencies or intended, "irrespective of an actual controversy or dispute," that we should review the kinds of proposed agreements presented by the Director for our review. Thus, we resort to the legislative history, to determine legislative intent as to our jurisdiction. *See, e.g., Bragg v. State Farm Mut. Auto. Ins. Co.*, 81 Hawai'i 302, 306, 916 P.2d 1203, 1207 (1996);[4] *Pacif-*

---

3. Under a lease purchase agreement, a state agency leases equipment from a vendor or real property from a developer or other party. The rental payments made by the state agency are applied to the purchase price of the equipment or real property. At the end of the lease term, the state agency acquires title to the property.

Generally, the lessor assigns its rights and interest under the lease agreement, including the right to receive rental payments to a financial institution acting as a Trustee. After the lease/purchase agreement is assigned to a financial institution, the Trustee will execute and deliver certificates of participation evidencing proportional interests in the rental payments. The certificates of participation are then sold at a public offering or by negotiated sale or competitive bid, or are privately placed with investors. The proceeds from the sale are held by the Trustee and used to acquire or construct the project or purchase the equipment and pay administrative and transaction costs.

4. In *Bragg*, we noted:

Although it is true that "a cardinal rule of statutory construction [is] that courts are bound, if rational and practicable, to give effect to all parts of a statute, and that no clause, sentence, or word shall be construed as superfluous, void, or insignificant if a construction can legitimately

be found which would give force to and preserve all the words of the statute," *Dines v. Pacific Ins. Co., Ltd.*, 78 Hawai'i 325, 331, 893 P.2d 176, 182 (1995) (citation omitted), it is also true that, even when strictly construing a statute,

our primary duty in interpreting and applying statutes is to ascertain and give effect to the legislature's intention to the fullest degree. Although the intention of the legislature is to be obtained primarily from the language of the statute itself, we have rejected an approach to statutory construction which limits us to the words of a statute, for when aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no rule of law which forbids its use, however clear the words may appear on superficial examination. Thus, the plain language rule of statutory construction, does not preclude an examination of sources other than the language of the statute itself even when the language appears clear upon perfunctory review. Were this not the case, a court may be unable to adequately discern the underlying policy which the legislature seeks to promulgate and, thus, would be unable to determine if a literal construction would produce an absurd or unjust result, inconsistent with the policies of the statute.
*Sato v. Tawata*, 79 Hawai'i 14, 17, 897 P.2d 941, 944 (1995) (citation, internal quotation signals, brackets, and ellipsis points omitted).

ic Int'l. Services Corp. v. Hurip, 76 Hawai'i 209, 217, 873 P.2d 88, 96 (1994) (when construing an ambiguous statute, courts may refer to the legislative history as an interpretive tool).

■ By enacting chapter 37D, the legislature sought to avoid jeopardizing the ratings of the State's bonds and implemented a judicial review provision authorizing the Director "to petition the Supreme Court for an opinion on whether municipal leases count against the debt ceiling." Hse. Conf.Comm.Rep. No. 112, in 1996 House Journal, at 1015. From this language, along with the purpose and intent language of Act 119, § 1, quoted above, we conclude that the legislature intended that this court should consider general questions regarding the validity of proposed financing agreements and did not limit our review to actual, individual financing agreements.[5] Thus, we conclude that we have jurisdiction to answer the question submitted.

### III. *Discussion*

#### A. *Case Law From Other Jurisdictions*

Case law from other jurisdictions, based upon specific statutes, constitutional provisions, and legislative history unique to those jurisdictions, is instructive, but of limited assistance. We note, however, that other states have instituted a variety of financing agreements in an attempt to avoid constitutional debt limitations, *State ex rel. Kane v. Goldschmidt*, 308 Or. 573, 783 P.2d 988, 989 (1989), and a majority of other jurisdictions considering the issue have upheld lease purchase agreements resembling those allowed by chapter 37D, asserting that the nonappropriation mechanism prevents the transaction from being a constitutional debt.

81 Hawai'i at 306, 916 P.2d at 1207.

**5.** Article III, Section 2 of the Constitution of the United States confines the federal judiciary's authority to "cases" and "controversies." "[T]hose words limit the business of the federal courts to questions presented in an adversary context and in a form historically viewed as capable or resolution through the judicial process." Thus, "courts created pursuant to Article III are barred ... from deciding 'abstract, hypothetical or contingent questions.'" This restriction of power stems "directly from the 'case or controversy' requirement." . . . .

For example, the Alaska Supreme Court, in *Carr–Gottstein Properties v. State*, 899 P.2d 136 (Alaska 1995), reviewed the approval of a lease purchase agreement to determine whether the agreement violated the debt restriction provision of the Alaska Constitution:

> [T]he cases cited ... define constitutional "debt" as a term of art used to describe an obligation involving borrowed money where there is a promise to pay sums such as rents accruing in the future whether funds are available or not. Where a lease-purchase agreement does not require a future legislature to appropriate funds, the agreement is not a long-term binding obligation to repay borrowed money pursuant to article IX, section 8, and is not "debt" as defined by the Alaska Supreme Court.

899 P.2d at 142–143 (internal quotations and citations omitted).

In *State ex rel. Kane v. Goldschmidt*, 308 Or. 573, 783 P.2d 988 (1989), a taxpayer challenged the constitutionality of a 1989 law that contained provisions for purchase contracts that included nonappropriation clauses. In upholding the challenged law, the Oregon Supreme Court said:

> [The Oregon statute] and the proposed agreements make explicit and clear that the state has no obligation to make payments beyond the amount of any current appropriation. . . .
>
> The State's promise of repayment is conditioned upon the willingness of future legislative assemblies to appropriate the funds. The State does not promise that future legislatures will appropriate any funds. The lenders take the risk of non-payment. This aspect of the legislation

While the courts of the State of Hawaii are not bound by a "case or controversy" requirement, we nonetheless recognize that the "'prudential rules' of judicial self-governance 'founded in concern about the proper—and properly limited—role of courts in a democratic society' are always of relevant concern." For "even in the absence of constitutional restrictions, courts [must] still carefully weigh the wisdom, efficacy, and timeliness of an exercise of their power before acting." *State v. Fields*, 67 Haw. 268, 273–74, 686 P.2d 1379, 1385 (1984) (footnote and citations omitted) (alterations in original).

does not create a fixed charge against future revenues nor does it impair the flexibility of planning and the ability of future legislatures to avoid a tax increase....

Nor does the fact that the legislature may feel compelled to make payments in a future biennium out of fiscal concern to protect its credit rating convert the state's obligation into a legal one....

*Goldschmidt*, 783 P.2d at 997.[6]

Despite the presence of nonappropriation clauses, some courts have invalidated lease financing. Those courts reasoned that future legislatures will feel compelled to appropriate funds. In *Montano v. Gabaldon*, 108 N.M. 94, 766 P.2d 1328 (1989), for example, the lease purchase agreement was a · county's contract with a private contractor for the construction of a new jail on county land. The agreement contained a provision providing, in case of default, that the contractor would acquire permanent title to the land and the jail facility. Despite a nonappropriation provision allowing for termination of the contract at the end of any fiscal year that the County Commission failed to appropriate sufficient funds, the *Montano* court concluded that the agreement constituted unconstitutional debt:

[W]e are of the opinion that once the County accepted this lease, it would be obligated to continue making rental payments in order to protect a growing equitable interest in the facility, as well as to protect the County's interest in the title to County land. This is the type of future

economic commitment that requires the arrangement to be approved by the voters. *Montano*, 766 P.2d at 1330; *see also State ex rel. Nevada Bldg. Auth. v. Hancock*, 86 Nev. 310, 468 P.2d 333 (1970) (striking down a lease revenue bond agreement that contained a nonappropriation clause based upon a finding that it was inconceivable that the legislature would default or refuse to appropriate funds because the good faith of Nevada would not allow it).

We have carefully considered the reasoning of this minority view, and have concluded that it does not apply to financing agreements prepared in accordance with HRS chapter 37D. First, chapter 37D provides the specific remedies available when the state agency defaults, and transfer of title to land is not an option. *See* HRS § 37D-3(5) (a lease may grant the lessor the right to evict the agency and exclude it from possession of the real property for the term of the lease). Next, Hawai'i law provides that each lease must state clearly that the decision to appropriate funds is entirely within the discretion of the legislature. Given the fact that the Hawai'i legislature requires a nonappropriation clause, future legislatures are not required and should not feel compelled to fund the financing agreements.

B. *Hawai'i financing agreements containing nonappropriation clauses and certain specific language are not bonds or instruments of indebtedness and are not counted toward Hawaii's constitutional debt limit.*

When analyzing constitutional provisions,

6. *See also Opinion of the Justices*, 335 So.2d 376, 379–380 (Ala.1976); *Glennon Heights, Inc. v. Central Bank & Trust*, 658 P.2d 872, 878–79 (Colo.1983); *State v. Brevard County*, 539 So.2d 461, 463–64 (Fla.1989); *Berger v. Howlett*, 25 Ill.2d 128, 182 N.E.2d 673, 675 (1962); *Book v. State Office Building Commission*, 238 Ind. 120, 149 N.E.2d 273, 286–87 (1958); *State ex rel. Fatzer v. Armory Bd.*, 174 Kan. 369, 256 P.2d 143, 151 (1953); *Warren County Fiscal Court v. Warren County Tuberculosis Sanitorium Corp.*, 272 S.W.2d 331, 332 (Ky.1954); *Edgerly v. Honeywell Information Systems, Inc.*, 377 A.2d 104, 108 (Me.1977); *St. Charles City–County Library Dist. v. St. Charles Library Bldg. Corp.*, 627 S.W.2d 64, 66–68 (Mo.App.1981); *Ruge v. State*, 201 Neb. 391, 267 N.W.2d 748, 750–51 (1978); *Enourato v. New Jersey Bldg. Auth.*, 90 N.J. 396, 448 A.2d 449, 455–56 (1982); *Schulz v. State*, 84

N.Y.2d 231, 616 N.Y.S.2d 343, 639 N.E.2d 1140 (1994), *cert denied* 513 U.S. 1127, 115 S.Ct. 936, 130 L.Ed.2d 881 (1995); *Halstead v. McHendry*, 566 P.2d 134, 137–38 (Okla.1977); *Caddell v. Lexington County School Dist. No. 1*, 296 S.C. 397, 373 S.E.2d 598, 599 (1988); *Millar v. Barnett*, 88 S.D. 460, 221 N.W.2d 8, 9–10 (1974); *Texas Public Building Authority v. Mattox*, 686 S.W.2d 924, 927–29 (Tex.1985); *Municipal Building Authority of Iron County v. Lowder*, 711 P.2d 273, 278–80 (Utah 1985); *Dykes v. Northern Virginia Transp. Dist. Comm.*, 242 Va. 357, 411 S.E.2d 1, 9–10 (1991), *cert denied* 504 U.S. 942, 112 S.Ct. 2277, 119 L.Ed.2d 203 (1992); *Department of Ecology v. State Fin. Comm.*, 116 Wash.2d 246, 804 P.2d 1241, 1244–47 (1991); *State ex rel. Thomson v. Giessel*, 271 Wis. 15, 72 N.W.2d 577 (1955).

[t]his court has noted that "the words of the constitution are presumed to be used in their *natural sense* ... 'unless the context furnishes some ground to control, qualify, or enlarge [them].'" *State ex rel. Amemiya v. Anderson*, 56 Haw. 566, 577, 545 P.2d 1175, 1182 (1976) (brackets in original) (emphasis added) (quoting *Employees' Retirement System v. Ho*, 44 Haw. 154, 159, 352 P.2d 861, 864–65).

*Convention Ctr. Auth. v. Anzai*, 78 Hawai'i 157, 165, 890 P.2d 1197, 1205 (1995).

Under article VII, section 12 of the Hawai'i Constitution, the term "bond" means "bonds, notes, and other instruments of indebtedness."[7] Article VII, section 13 establishes a debt limit for "general obligation bonds" issued by the State.[8] Generally, a "bond" is "a certificate or evidence of a debt on which the issuing ... governmental body promises to pay the bondholders a specified amount of interest for a specified length of time and to repay the loan on the expiration date." *Black's Law Dictionary* 178 (6th ed. 1990). Similarly, a "note" is an "instrument containing an express and absolute promise of the signer ... to pay a specified person or order, or bearer, a definite sum of money at a specified time...." *Id.* at 1060. Finally, a "debt instrument" is a "[w]ritten promise to repay a "debt," *Id.* at 404, defined as:

[a] sum of money due by certain and express agreement. A specified sum of money owing to one person from another, including not only obligation of debtor to pay, but right of creditor to receive and enforce payment ...

A fixed and certain obligation to pay money or some other valuable thing or things, either in the present or in the future....

*Id.* at 403 (citations omitted).

■ Thus, natural usage of the terms "bonds," "notes," and "instruments of indebtedness" in the article VII, section 12 definition of "bond" indicates that a bond is an instrument that requires an unconditional repayment and is a future, fixed obligation of the State.

Repayment of HRS chapter 37D financing agreements, unlike repayment of bonds, is not unconditional. The legislature is not required to appropriate money to pay obligations due under HRS chapter 37D financing agreements. Section 5 of HRS chapter 37D denies the holder of any financing agreement "the right to compel any exercise of taxing power of the agency to pay such financing agreements or the interest thereon and no moneys other than amounts appropriated or otherwise held in trust for such purposes shall be required to be applied to the payments thereof." The same section also provides that an HRS chapter 37D financing agreement is "not ... an ... obligation for which the full faith and credit of the agency is pledged, and no claim or lien" can be placed "on any revenues or other moneys of the agency except the moneys appropriated or held in trust for such purpose." The lack of an obligation to repay HRS chapter 37D financing agreements is in stark contrast to article VII, section 12's definition of a "general obligation bond," including reimbursable general obligations bonds, as a pledge of repayment against the full faith and credit of the State or a political subdivision.

7. Article VII, section 12 provides, in part:

1. The term "bonds" shall include bonds, notes and other instruments of indebtedness. 2. The term "general obligation bonds" means all bonds for the payment of the principal and interest of which the full faith and credit of the State or a political subdivision are pledged and, unless otherwise indicated, includes reimbursable general obligation bonds.

8. Article VI, section 13 provides:

General obligations bonds may be issued by the State; provided that such bonds at the time of issuance would not cause the total amount of principal and interest payable in the current or any future fiscal year, whichever is higher, on such bonds and on all outstanding general obligation bonds to exceed: ... a sum equal to eighteen and one-half percent of the average of the general fund revenues of the State in the three fiscal years immediately preceding such issuance....

A sum equal to fifteen percent of the total of the assessed values for tax rate purposes of real property in each political subdivision, as determined by the last tax assessment rules pursuant to law, is established as the limit of funded debt of such political subdivision that is outstanding and unpaid at any time.

Because chapter 37D financing agreements are conditional, do not compel future legislatures to appropriate money for repayment, require no payment of amounts owed if money is not appropriated, and the creditor cannot enforce payment, HRS chapter 37D financing agreements are not "bonds, notes, or other instruments of indebtedness" and do not constitute debt within the meaning of article VII, sections 12 and 13 of the Hawai'i Constitution. Inasmuch as the financing agreements are not bonds and do not constitute debt, in the constitutional sense, they do not count against the State's debt ceiling pursuant to article VII, § 13 of the Hawai'i Constitution.

■ In order not to count against the State's debt ceiling, the language in any HRS chapter 37D financing agreement must comply with chapter 37D and must, at minimum: (1) contain a non-appropriation clause; (2) specifically provide that the agreements are not backed by the full faith and credit of the state; and (3) limit the recourse upon default to the recourse set out in chapter 37D.

## IV. *Conclusion*

Based upon the foregoing, we conclude that financing agreements, implemented in accordance with chapter 37D and containing nonappropriation clauses and clauses that make clear to any participant or purchaser that the agreements are not unconditional obligations of the state and are not backed by the full faith and credit of the state, are not "bonds" pursuant to article VII, section 12, and, thus, will not count toward the debt ceiling of article VII, section 13. Because it is impossible for us to predict or envision all problems that may arise in the future regarding chapter 37D financing agreements, this opinion is limited to the issues addressed and is not a blanket endorsement of all financing agreements entered into pursuant to chapter 37D.