**Electronically Filed
Supreme Court
SCWC-29352
14-FEB-2014
08:56 AM**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

STATE OF HAWAI'I, ex rel. DAVID M. LOUIE, Attorney General, and
DEAN H. SEKI, Comptroller of the State of Hawai'i,
Petitioners/Plaintiffs-Appellants, Cross-Appellees,

vs.

HAWAII GOVERNMENT EMPLOYEES ASSOCIATION, AFSCME LOCAL NO. 152,
AFL-CIO; UNITED PUBLIC WORKERS, AFSCME LOCAL NO. 646, AFL-CIO;
ROYAL STATE CORPORATION; ROYAL STATE NATIONAL INSURANCE COMPANY,
LIMITED; THE ROYAL INSURANCE AGENCY, INC.; VOLUNTARY EMPLOYEES'
BENEFIT ASSOCIATION OF HAWAII; MANAGEMENT APPLIED PROGRAMMING,
INC., Respondents/Defendants-Appellees, Cross-Appellants.

SCWC-29352

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(ICA NO. 29352; CIV. NO. 02-1-0685)

FEBRUARY 14, 2014

RECKTENWALD, C.J., ACOBA, and McKENNA, JJ., WITH
NAKAYAMA, J., DISSENTING, WITH WHOM POLLACK, J., JOINS

OPINION OF THE COURT BY RECKTENWALD, C.J.

This case arises out of the Hawaii Public Employees

Health Fund's "porting" program. Under the program, state and

county employees could choose to enroll in health benefits and long-term care benefits plans offered by their respective employee unions, rather than Health Fund-sponsored plans. For employees who chose a union-sponsored plan, the Health Fund would transfer or "port" to the unions the government employers' contributions to the cost of providing insurance. See Hawaiʻi Revised Statutes (HRS) §§ 87-4, 87-22.3, 87-22.5, 87-23 (repealed).[1] The instant action centers on the State's contention that public funds ported to certain unions exceeded the amounts allowed by law.[2]

Specifically, the Health Fund statutes provided that amounts ported to the unions would be either the public employer's contribution as determined in relevant collective bargaining agreements, or the "actual monthly cost of the coverage," whichever was less. HRS §§ 87-4, 87-22.3, 87-22.5, 87-23. The State alleged that public funds ported to the Hawaiʻi Government Employees Association (HGEA) and the United Public

---

[1] HRS chapter 87 was repealed in 2001, effective July 1, 2003. 2001 Haw. Sess. Laws Act 88, §§ 3, 10 at 150-51. Reference to chapter 87's repeal is not repeated with each citation. Chapter 87 was replaced by chapter 87A, governing the Hawaii Employer-Union Benefits Trust Fund. See id. § 1 at 138; HRS ch. 87A.

[2] This suit was initially brought by former Attorney General Earl I. Anzai, and former Comptroller Glen M. Okimoto, on behalf of the State. The present petitioners/plaintiffs-appellants/cross-appellees were substituted automatically pursuant to Hawaiʻi Rules of Appellate Procedure (HRAP) Rule 43(c)(1) (2010).

Workers (UPW) exceeded the "actual [monthly] cost of coverage."[3] The circuit court ultimately bifurcated the case, requiring the State to seek a declaratory judgment with regard to the interpretation of the statutory phrase "actual monthly cost of the coverage" before allowing litigation on the State's remaining claims. The State then argued that the phrase means

> (1) premiums paid to insurance carriers in arm's length transactions, less any refunds, rate credits, and reimbursements, where the carrier is independent of HGEA and UPW, meaning, not controlled by, related to, or conspiring with leaders of HGEA and UPW to circumvent statutory limits on amounts ported by the Health Fund, or (2) allowable claims paid or incurred, plus reasonable administrative fees and profits where the carrier is not independent of HGEA and UPW.

The circuit court rejected the State's interpretation and concluded that the term means "the premium charged by and paid to the carrier." Because there was no dispute that the ported amount equaled the premium charged and paid, the circuit court's declaratory ruling essentially ended the State's case, and the circuit court entered judgment against the State.[4]

The State appealed, arguing, inter alia, that (1) the circuit court erred when it interpreted the phrase "actual monthly cost of the coverage" to mean "the premium charged by and paid to the carrier," and (2) the circuit court erred when it

---

[3] The respondents/defendants-appellees/cross-appellants in the instant case include the Hawaii Government Employees Association (HGEA); United Public Workers (UPW); Royal State Corporation (Royal State), Royal State National Insurance Company, Ltd.; The Royal Insurance Agency, Inc.; Voluntary Employees' Benefit Association of Hawaiʻi; and Management Applied Programming, Inc.

[4] The Honorable Eden Elizabeth Hifo presided.

denied the State leave to file a second amended complaint and "rewrote" the State's complaint.

The Intermediate Court of Appeals affirmed the circuit court's judgment with respect to its interpretation of "actual monthly cost of the coverage."  The ICA further determined, inter alia, that in light of its affirming the circuit court's interpretation, the issue of whether the circuit court erred when it denied the State leave to file a second amended complaint and "rewrote" the State's complaint was no longer justiciable.  The ICA thus declined to reach that issue.

In its application for writ of certiorari, the State raises the following questions:

> 1.  Did the [ICA] gravely err when it interpreted the phrase "actual monthly cost of the coverage" from Hawaiʻi Revised Statutes (HRS) §§ 87-22.3, 87-22.5 and 87-23 to mean the premium set by an insurance carrier, <u>even if</u> the State of Hawaii alleges that (a) the insurance carriers had extraordinarily high gross profits, (b) the insurance carriers had extraordinarily high administrative fees, and (c) the amount charged for the premium was grossly inflated and did not reflect the "actual cost" of the coverage in a legitimate arm's-length business transaction?
>
> 2.  Did the ICA gravely err when it failed to vacate the circuit court's orders denying the State leave to amend its complaint, when the circuit court (a) denied leave to amend even though the court had previously granted leave to file similar causes of action, (b) interpreted Hawaii Rules of Civil Procedure (HRCP) [Rule] 9 incorrectly to conclude that the State's civil conspiracy to defraud claim was insufficiently precise, (c) misused HRCP [Rule] 12(f) in order to edit the State's complaint itself, and (d) precluded the State from amending its definition of "actual cost of coverage" to make the definition consistent with the complaint as amended by the court?

(Emphasis in original).

We hold that the circuit court did not err in interpreting "actual monthly cost of the coverage" in chapter 87 to mean "the premium charged by and paid to the [insurance] carrier."  We recognize that the State has raised serious and troubling allegations regarding improper financial dealings amongst the defendants.  However, the State chose to tie its allegations to the statutes, and conceded at oral argument that its claims, including conspiracy to defraud the State, depended entirely on its interpretation of the statutory phrase "actual monthly cost of the coverage."  We cannot rewrite the State's complaint to allege causes of action the State did not pursue.  Nor can we rewrite the statutes to include prohibitions that the legislature never contemplated.  Even if the State could have asserted a claim for conspiracy to defraud wholly apart from the provisions of chapter 87, it did not do so.  The question here, as framed by the State, is a narrow one:  do the factual allegations constitute a violation of the provisions of chapter 87?  The answer to that question is no.

The State concedes that such a disposition would render moot its second argument regarding the pleadings process.  Thus, we do not reach that issue.  Accordingly, we affirm the judgment of the ICA.

## I.  Background

The following factual background is taken from the record on appeal.

### A.  Health Fund

In 1961, the Legislature established the Health Fund for the purpose of providing public employees and their dependents with a health benefits plan.  1961 Haw. Sess. Laws Act 146, § 1 at 191.  The Health Fund was defined to consist of "contributions, interest, income, dividends, refunds, rate credits and other returns."  Id. at 192.  Act 146 required the State to make monthly contributions to the Health Fund for health benefits for employees and their dependents.  Id. at 192-93.  Employees also were required to make a monthly contribution to the Health Fund for "the difference between the monthly charge of the health benefits plan selected by the employee-beneficiary and the State's contribution to the fund."  Id. at 193.  The Health Fund board was authorized to contract with carriers to provide health benefits plans.  Id. at 194.  During the life of the Health Fund, which was replaced by the Hawaii Employer-Union Health Benefits Trust Fund (EUTF) on July 1, 2003, the Health Fund expanded the benefits provided to public employees to include plans such as prescription drug, vision, dental, and group life insurance plans.  See 1965 Haw. Sess. Laws Act 235, § 2 at 393; 1967 Haw. Sess. Laws Act 110, § 3 at 101; 1985 Haw.

Sess. Laws Act 304, §§ 1-2 at 816-17.  Initially, the public employer's contribution was a specific dollar amount determined by statute.  See, e.g., 1961 Haw. Sess. Laws Act 146, § 1 at 192.  However, effective July 1, 1985, the legislature amended the Health Fund statute to require government employers to contribute amounts as set forth in "the applicable public sector collective bargaining agreement" or as established under HRS chapter 89C, which pertains to public officers and employees excluded from collective bargaining.  1984 Haw. Sess. Laws Act 254, §§ 4, 9 at 570-71, 573; HRS § 87-4(a) (1985 & 1993).

Beginning at various times during the existence of the Health Fund, the applicable statutes were amended to allow state and county employees to choose to enroll in union-sponsored insurance plans, in lieu of Health Fund-sponsored plans.  See 1967 Haw. Sess. Laws Act 110, § 3, at 101; 1984 Haw. Sess. Laws Act 71, § 1, at 123.  For employees who chose a union-sponsored plan, the Health Fund would pay or "port" to the unions the government employers' contributions to the cost of providing insurance.  See HRS §§ 87-4, 87-22.3, 87-22.5, 87-23.

Under the statutory scheme at the time of the instant case, the Health Fund was to provide health benefits to public employees in the following manner:

> (1)   For those employee-beneficiaries who are not participating in a health benefits plan of an employee organization . . . , the [Health Fund] shall establish health benefits plans and the

requirements for eligibility under the health benefits plans; or

> (2) For employee-beneficiaries who participate in the health benefits plan of an employee organization, the [Health Fund] shall pay a monthly contribution for each employee-beneficiary, in the amount provided in section 87-4(a),[5] <u>or the actual monthly cost of the coverage</u>, whichever is less, towards the purchase of health benefits under the health benefits plan of an employee organization.

HRS § 87-22.3 (Supp. 2002) (emphasis added).

Similar language appeared in HRS § 87-22.5[6]

(determining dental plan benefits) and HRS § 87-23[7] (determining

---

[5] See infra note 8.

[6] HRS § 87-22.5 (Supp. 2002) required the Health Fund to provide dental plan benefits to the children of employee-beneficiaries younger than 19 in the following manner, in relevant part:

> (1) For those children of employee-beneficiaries who are not participating in a dental program of an employee organization . . . , the [Health Fund] shall determine a dental plan and eligibility requirements for such benefits based upon a statutory monthly contribution per enrolled child;

> (2) For those children of employee-beneficiaries who participate in the dental program of an employee organization, the [Health Fund] shall allot the statutory monthly contribution per enrolled child <u>or the actual monthly cost of the child's coverage</u>, whichever is less, towards the purchase of dental plan benefits under the dental program of an employee organization[.]

(Emphasis added).

[7] HRS § 87-23 (Supp. 2002) required the Health Fund to provide benefits under a group life benefit program or group life insurance program to employees, in relevant part:

> (1) For those employees who are not participating in a group life benefit program or group life insurance program of an employee organization . . . , the [Health Fund] shall determine a group life insurance benefit plan and eligibility requirements for such benefits based upon the amount to be contributed per employee

(continued...)

group life benefits).  Under this statutory scheme, the Health

Fund's contribution ported to the union would be either (1) the

public employer's contribution for the cost of insurance, as

determined by the applicable collective bargaining agreement, see

HRS § 87-4;[8] or (2) the actual monthly cost of the coverage,

_____

[7](...continued)
            under section 87-4(c);

        (2)    For those employees who participate in a group
               life benefit program or group life insurance
               program of an employee organization, the [Health
               Fund] shall pay a monthly contribution for each
               employee, in the amount determined under section
               87-4(c), or the actual monthly cost of the
               coverage, whichever is less, towards the
               purchase of benefits under the group life
               benefit program or group life insurance program
               of an employee organization[.]

(Emphasis added).

    [8]    HRS § 87-4 (1993) provided, in relevant part, that the State and
the several counties pay to the Health Fund a monthly contribution equal to:

        (a) . . . the amount established under chapter 89C
        [governing public officers and employees excluded from
        collective bargaining] or specified in the applicable
        public sector collective bargaining agreement,
        whichever is appropriate, for each of their respective
        employee-beneficiaries and employee-beneficiaries with
        dependent-beneficiaries, which shall be used toward
        the payment of costs of a health benefits plan;
        provided that the monthly contribution shall not
        exceed the actual cost of a health benefits plan.
        . . .
        (b) . . . the amount established under chapter 89C or
        specified in the applicable public sector collective
        bargaining agreement, whichever is appropriate, for
        each child who has not attained the age of nineteen of
        all employee-beneficiaries who are enrolled for dental
        benefits.  The contributions shall be used towards the
        payment of costs of dental benefits of a health
        benefits plan. . . .
        (c) . . . the amount established under chapter 89C or
        specified in the applicable public sector collective
        bargaining agreement, whichever is applicable, for
        each of their respective employees, to be used towards
        the payment of group life insurance benefits for each
        employee.

whichever was less.  As aptly explained by the ICA majority

opinion:

> First, say the applicable collective bargaining
> agreement provided that the public employer would pay
> 60% of the monthly health premiums for the unionized
> employees.  This calculation was based on the monthly
> premium of the medical plan sponsored by the Health
> Fund, which in turn was defined as the plan with the
> largest number of active employee enrollments as of
> December 31st of the previous fiscal year.[9]  If the
> most popular plan's monthly premium was, say, $100,
> the amount ported to the union would be, at the most,
> $60.  If, however, the "actual cost of coverage" of
> the union's health benefits plan was $50, then the
> maximum amount that could be ported under this
> statutory provision would be $50.

Before participating in the Health Fund's porting

program, unions were required to submit to the Health Fund a copy

of their charters and by-laws and a letter that:

> (1)  Identifies the name and address of the person
>      who is authorized to represent the employee
>      organization;
> (2)  Certifies that its health benefits plan complies
>      with all applicable State laws; and
> (3)  Agrees that its health benefits plan complies
>      and will continue to comply with the following
>      requirements:
>      (A)  Maintain reasonable accounting and
>           enrollment records and furnish such
>           records and reports as may be requested by
>           the board, its administrator, or the State
>           comptroller;
>      (B)  Permit representatives of the board and
>           State comptroller to audit and examine its
>           records that pertain to its health
>           benefits plan at reasonable times and
>           places as may be designated by the board
>           or the State comptroller; and
>      (C)  Accept adjustments for error or other
>           reasons as may be required under chapter
>           87, Hawaii Revised Statutes, and chapters
>           30 through 36 of title 6, administrative
>           rules.

---

[9]   The aforementioned language appeared in the State's collective
bargaining agreements with UPW and HGEA for July 1, 1999 through June 30,
2003, which were attached to the State's motion for summary judgment.

Hawaiʻi Administrative Rules (HAR) § 6-34-9; see also HAR §§ 6-35-5 (dental plan) & 6-36-7 (life insurance plan).

In June 1989, HGEA submitted a letter to the Health Fund that certified that its plans complied with state laws, and agreed to, inter alia, permit the Health Fund and state comptroller to audit and examine its records.  UPW submitted similar certifications to the Health Fund in June 1989 and June 1990.  Both HGEA and UPW identified Melvin Higa, chief executive officer of Royal State Corporation (Royal State) and Mutual Benefit Association of Hawaii, as HGEA's and UPW's representative regarding their benefit plans.

In 1999, the State Auditor conducted an operational audit of the Health Fund and reported that the Health Fund board never audited the union benefit plans and thus "[fell] short of fulfilling its fiduciary responsibility to carry out the purposes of the health fund."[10]  The State Auditor's report stated that "in spite of the significant increases in premiums ported to union health plans, the current board [had] not requested the unions to provide information on their health benefit plans' operations until this study."  The Auditor's report further stated that:

> By statute, the amount ported is determined by collective bargaining agreements or the actual monthly cost of the coverage, whichever is less. However, without auditing the union health benefit plans, the

---

[10]    A copy of a portion of the State Auditor's report was attached as Exhibit 7 to the State's motion for a preliminary injunction.

> board has no way of verifying the actual monthly cost
> of the coverage. Beyond the unions' assertion, the
> board has no assurance that the ported funds are used
> for purchasing health benefits for union plan
> enrollees. At least one union that was about to
> receive a premium refund from a health insurance
> carrier has contacted the health fund inquiring about
> the disposition of the refund. None of the union
> plans has ever returned any difference between what it
> cost to provide coverage and what was ported to them.

As a result of the State Auditor's report, the State Comptroller sent notices to public employee unions, including HGEA and UPW, requesting that they make their records available for an audit.

**B.    Circuit Court Proceedings**

On March 15, 2002, the State filed a complaint against HGEA, UPW, and Royal State, alleging that the State sought to audit the public employee unions' welfare benefit plans, and that every union except for HGEA and UPW produced or agreed to produce their records for audit. According to the complaint and correspondence attached as exhibits to the complaint, UPW responded by requesting, inter alia, copies of the Health Fund's administrative rules authorizing the audit, a specific list of records requested "in order for the UPW to determine whether the records you require are subject to the audit and to retrieve the records from storage[,]" and a list of names of the people who would be conducting the audit. The comptroller sent UPW a letter that, inter alia, provided copies of applicable sections of the Health Fund's administrative rules and identified Ernst & Young LLP as conducting the audit. On February 8, 2002, the

-12-

comptroller sent letters to the unions, including HGEA and UPW, with a description of the scope of the audit and a list of the required financial records for the audit.  In a memo dated February 11, 2002, UPW's state director requested copies of "the state and federal laws" that, inter alia, "require audits of the UPW Health."  In a letter dated March 1, 2002, the comptroller stated that the Hawaii Administrative Rules authorizing the audit were already provided to UPW, and stated that unless UPW stated in writing that it would "unconditionally make the previously described records available[,]" the comptroller would seek a court order requiring UPW to make its records available.  In a letter dated February 27, 2002, but time-stamped as received by the comptroller on March 5, 2002, UPW stated its "willingness to fully cooperate" with the audit "if such an audit is permissible by law."  UPW stated that "fundamental issues of authority, purpose, scope and objectives of the independent audit have not been satisfactorily resolved between the parties[,]" and requested a copy of the "RFP used in the procurement of an independent auditor and the contract with Ernst & Young to perform the independent audit."  In response, the comptroller stated, inter alia, that copies of the "RFP used to select E&Y and the E&Y engagement letter" would be made available for examination, but that such information was unnecessary "for UPW to honor its certified and unconditional commitment to make the

subject records available for audit[.]"  The comptroller further
stated that unless UPW sends a written "commitment to make the
subject records available" for the audit, "we will assume that
UPW has no intention of honoring its agreement without a court
order[.]"  The State alleged that HGEA and HGEA's representative,
Voluntary Employees' Benefit Association of Hawaii (VEBAH), also
did not cooperate with the State's audit.

The State's complaint against UPW, HGEA, and Royal
State alleged five claims for relief, including violation of the
Health Fund's administrative rules, right to an accounting,
breach of contract, breach of fiduciary duty, and promissory
estoppel.  The State sought an order granting a preliminary and
permanent injunction requiring the defendants and their officers
and agents to fully comply with the audit.  The State also sought
"an accounting of the payments made by the [Health] Fund since
July 1, 1994 through June 30, 2001 and the actual cost of
providing health, dental and group life insurance benefits to
those enrolled in Defendants' Welfare Benefit Plans, including
any premium credits or refunds received by the Defendants."  The
State also requested a decree of specific performance requiring
HGEA and UPW to honor their certification to make their records
available for inspection.

On March 22, 2002, the State filed a motion for
preliminary and permanent injunction requiring HGEA and UPW to

make records available for the audit, and restraining defendants from obstructing the audit or destroying or altering records within the scope of the audit. On April 23, 2002, the circuit court granted the State's motion for a preliminary injunction, and ordered HGEA, UPW, and their agents to make their records available to the State for review and audit.

On April 26, 2002, HGEA filed a motion for clarification or instructions regarding the circuit court's injunction order, stating that although HGEA wanted to comply with the order, the records at issue were physically possessed by VEBAH, which asserted that it was not an "agent" bound by the order. UPW joined HGEA's motion. On May 31, 2002, the circuit court granted HGEA's motion for clarification, and ordered UPW and HGEA to serve subpoenae duces tecum on VEBAH, the Royal Insurance Company, and Management Applied Programming, Inc. (MAP) for the required documents.

On October 1, 2003, the State moved for leave to file a first amended complaint. The proposed first amended complaint added VEBAH[11] and MAP[12] as defendants, and county finance officials as "Necessary Party Defendants." The proposed first amended complaint asserted nine causes of action: (1) conspiracy

---

[11] The proposed first amended complaint described VEBAH as a Hawaiʻi mutual benefit society affiliated with Royal State and alleged that VEBAH was "subject to the control of persons affiliated with HGEA and UPW."

[12] The proposed first amended complaint alleged that MAP was a Hawaiʻi corporation "engaged in the business of providing data processing services that is affiliated with Royal State Corp."

to defraud the State, (2) interference with contract, (3) assumpsit, (4) restitution and constructive trust, (5) equitable accounting, (6) specific performance, (7) injunction, (8) unjust enrichment, and (9) breach of fiduciary duty.  The proposed first amended complaint alleged, inter alia, that the defendants "purchased" contracts for insurance from various third-party insurers, under which the insurers were required to reimburse amounts paid by the defendants if the amounts paid exceeded allowable claims plus an agreed profit.  The proposed first amended complaint further alleged that the defendants received reimbursements from insurers under such contracts that should have been returned to the Health Fund, but were not.  The proposed first amended complaint also alleged that the Health Fund ported funds to provide insurance for HGEA and UPW members under plans that supplemented a spouse's health insurance, and that the actual cost of providing coverage under these supplemental plans was less than the ported amount.  The proposed first amended complaint further alleged that the difference should have been returned to the Health Fund, but was not. According to the proposed first amended complaint, the defendants "used or allowed the use of Welfare Benefit Plan funds to improperly make payments to or for the benefit of insiders" such as then-UPW executive director Gary W. Rodrigues and Rodrigues' daughter Robin Sabatini.

On November 18, 2003, the circuit court granted the State's motion for leave to file a first amended complaint "on condition that (1) there is specificity regarding alleged fraud and alleged civil conspiracy to defraud as required by [HRCP] Rule 9 and as interpreted by the Court, and (2) Plaintiffs make clear which defendants did certain things or failed to do certain things, rather than referring generically to 'Defendants.'" However, the State did not file the proposed first amended complaint. On June 10, 2004, the parties stipulated, inter alia, that VEBAH would disclose the requested records and the State would "withhold" filing the first amended complaint.

More than a year later, on January 18, 2006, the State filed a motion for leave to serve and file a second amended complaint and supplemental summons. The proposed second amended complaint (January 2006 proposed second amended complaint) was based on a December 1, 2005 report from the California accounting firm Biggs & Co., which reviewed VEBAH's records. The Biggs Summary Report[13] (Biggs report) concluded, inter alia, that it appeared that premiums received for benefit coverage underwritten by "independent insurance companies such as HMSA, Kaiser and Kapiolani" were "being used to cover the cost of insurance at an estimated break even basis, after excluding administrative fees and risk charges assessed by Royal State and VEBAH." The Biggs

_____

[13]  The Biggs report was attached to the State's motion to file a second amended complaint.

report also concluded that "self insured programs maintained by Royal State and VEBAH generated extremely high gross profits calculated on the amount of premiums collected less the cost of related claims paid."  In particular, the Biggs report discussed the high profitability of supplemental health programs underwritten by Royal State and VEBAH.  The Biggs report stated that such programs were "believed to generate high profitability and low risk to Royal State" for two principal reasons:

> First, these are both supplemental health care programs which generally provide excess health care coverage over and above the medical benefits provided under basic medical care programs such as HMSA, Kaiser, and Kapiolani.  In other words, the supplemental health care programs provide coverage for the insured's deductible portions and medical care costs beyond the limits of coverage of the basic medical programs.  <u>Since the basic medical care programs are structured to provide coverage for the majority of the health care costs, the supplemental programs inherently provide coverage for the less risky portion of medical care</u>.
> Second, <u>the amounts ported (i.e. porting rates) from the Health Fund for coverage of the supplemental programs are the same as for the major medical programs</u> under HMSA, Kaiser, Kapiolani, etc.  For instance, the medical coverage porting rates for HGEA AFSCME Local 152, AFL-CIO Unit single and family are $79.80 and $239.40 respectively, regardless of whether the employee maintains [supplemental or basic medical care programs].  A basic premise of insurance is that risk and cost are directly related in that the higher the risk, the higher the cost.  In this instance, the cost of the programs (i.e. the premium received) is the same but the supplemental programs are less risky and, correspondingly, more profitable.

(Emphases added).

According to the Biggs report, the gross profit generated by Royal State and VEBAH on their self insured programs "was excessively high compared to that realized by independent

-18-

insurance companies providing similar products."[14]  For example, the Biggs report stated that the gross profit – calculated as premiums less the cost of related claims paid – on Royal State's supplemental programs averaged 58.7 percent between July 1994 to June 2003.  According to the Biggs report, the "gross profit realized by Royal State on its self insured life program was significantly lower than for the other self insured programs but was still a healthy 36.1% for [fiscal year 1999-2000] and averaged 35.2% over the three fiscal years from July 1998 through June 2001.  The Biggs report further stated that while some administrative fees and costs assessed by Royal State and VEBAH "appeared reasonable and were consistent with contractual allowances, the totality of all the fees assessed appeared excessive, particularly in consideration of the high gross profit realized on self insured programs."

        The January 2006 proposed second amended complaint, which added as defendants Royal State National Insurance Company, Ltd. (RSN) and The Royal Insurance Agency (TRIA), alleged that HGEA and UPW transferred ported funds to VEBAH, Royal State, and TRIA to purchase or provide insurance coverage or related services for HGEA and UPW members.  The January 2006 proposed second amended complaint further alleged, inter alia, that between July 1, 1994 and June 30, 2003, the Health Fund ported

---

        [14]    The Biggs summary report did not state the gross profits "realized by independent insurance companies providing similar products."

funds to HGEA and UPW for supplemental health plans known as Comprehensive Health and Medical Plan (CHAMP), supplemental adult dental, drug, and vision plan (DDV), and Supplemental Health Plan (SHP).[15] CHAMP and SHP were underwritten by RSN, and DDV was underwritten by VEBAH. The January 2006 proposed second amended complaint also alleged that the Health Fund ported funds to HGEA and UPW for life insurance underwritten by RSN. The January 2006 proposed second amended complaint further alleged that the ported amounts for the foregoing plans exceeded the "actual cost of providing coverage[.]" For example, the January 2006 proposed second amended complaint alleged:

> 27. . . . During the period from July 1, 1994 to June 30, 2003, [the Health Fund] ported to HGEA over $68 million in employer contributions for [CHAMP, DDV and SHP] and almost $15 million to UPW. The actual cost of providing coverage under HGEA's plans did not exceed, however, $36 million, and under UPW's plans, it did not exceed $7 million. The difference, approximately $40 million, should have been returned to [the Health Fund], but it was not.
> 28. Amounts that [the Health Fund] ported to HGEA and UPW were used to provide life insurance underwritten by RSN. Premiums contributed by State and County employers for the three years ended June 30, 2003 were almost $22 million, while the actual cost of providing coverage did not exceed $16 million. The difference, approximately $6 million, plus any excess porting for other years, should have been returned to [the Health Fund], but it was not.

---

[15]    Attached as Exhibit L to the Biggs report were documents describing CHAMP, DDV, and SHP programs offered to HGEA and UPW members who were covered under their spouse's private sector or federal government medical plans. CHAMP was described as a "high deductible benefit plan" that works with coverage under the spouse's plan to reduce costs of catastrophic illness or injury. DDV was described as a supplemental benefit plan that pays a benefit on a claim for a covered dental, prescription drug, and vision expense. Finally, SHP was described as paying a benefit on a claim for a covered expense regardless of any other plan coverage. CHAMP, DDV, and SHP premiums were fully paid for by public employers; in other words, employees were not required to contribute.

29. Defendants HGEA, UPW, and VEBAH, either directly or through others, purchased insurance contracts from various third parties that required the insurer to refund or credit premiums that exceeded allowable claims plus an agreed profit. Defendants received reimbursements or rate credits under such contracts that should have been returned to [the Health Fund], but they were not.

30. Defendants HGEA and UPW used or permitted others to use amounts ported by [the Health Fund] to pay unreasonable administrative expenses and fees. Those amounts should have been returned to the Health Fund, but they were not.

31. Defendants RSC, RSN, TRIA, VEBAH, and MAP retained or received, or allowed the use of ported funds by others for, unreasonable administrative expenses and fees. Those funds exceeded the <u>actual cost of insurance coverage</u> and should have been returned to [the Health Fund], but they were not.

32. Defendants HGEA, UPW, RSC, TRIA, and VEBAH used, or allowed the use of, ported funds to make payments to themselves or to related parties for Welfare Benefit Plans in amounts that exceeded the <u>actual cost of coverage</u>. Such excessive payments should have been returned to [the Health Fund], but they were not.

(Emphases added).

The January 2006 proposed second amended complaint also alleged, inter alia, that at various times, VEBAH executives representing HGEA, a Royal State Group executive representing HGEA and UPW, and UPW director Gary Rodrigues requested that the Health Fund port monthly employer contributions for certain employee or retiree health and group life plans, and that such requests "certified falsely that the amounts specified therein did not exceed the <u>actual monthly cost</u> of covering" employees, dependents and/or retirees under those plans. (Emphasis added). The January 2006 proposed second amended complaint alleged ten causes of action, including conspiracy to defraud the State, interference with contract, assumpsit, false claims, restitution

and constructive trust, equitable accounting, specific
performance, injunction, unjust enrichment, and breach of
fiduciary duty.

HGEA, Royal State, and UPW opposed the State's motion
to file a second amended complaint. On June 2, 2006, the circuit
court denied without prejudice the State's motion for leave to
file a second amended complaint and bifurcated the case.
Specifically, the circuit court ruled as follows:

> 1. The motion is denied without prejudice as to
> the proposed First Cause of Action (Conspiracy to
> Defraud the State) on the grounds that it fails to
> comply with Rule 9(b) of the Hawaii Rules of Civil
> Procedure.[16] Failure to comply with Rule 9(b) in
> any further proposed amended complaint will result in
> denial of the fraud and conspiracy claims with
> prejudice;
> 2. [The State] may move to amend its complaint
> to seek a declaratory ruling as to the meaning of the
> term "actual monthly cost of the coverage," as used in
> former Sections 87-22.3, 87-22.5, and 87-23 of the
> Hawaii Revised Statutes;
> 3. The motion is denied in all other respects
> at this time. If [the State] amends the complaint as
> provided in paragraph numbered 2 above, and the court
> issues a ruling that is consistent with the theory
> underlying the proposed Second Amended Complaint, then
> [the State] may further seek leave to amend to assert
> its remaining causes of action.

(Emphases added).

On June 26, 2006, the State filed a second motion for
leave to file a second amended complaint. The second proposed
second amended complaint (June 2006 proposed second amended
complaint) asserted only one cause of action, a "Claim for

---

[16]     HRCP Rule 9(b) (2000) provides: "In all averments of fraud or
mistake, the circumstances constituting fraud or mistake shall be stated with
particularity. Malice, intent, knowledge, and other condition of mind of a
person may be averred generally."

Declaratory Judgment[,]" and sought a declaratory judgment that the term "actual monthly cost of the coverage" as used in HRS §§ 87-22.3, 87-22.5, and 87-23 means

> (1) premiums paid to insurance carriers in arm's length transactions, less any refunds, rate credits, and reimbursements, where the carrier is independent of HGEA and UPW, meaning, not controlled by, related to, or conspiring with leaders of HGEA and UPW to circumvent statutory limits on amounts ported by the Health Fund, or (2) allowable claims paid or incurred, plus reasonable administrative fees and profits where the carrier is not independent of HGEA and UPW.

Although the June 2006 proposed second amended complaint asserted only a declaratory judgment claim, it included many of the factual allegations asserted in the January 2006 proposed second amended complaint, including allegations that ported amounts exceeded the actual cost of coverage and that HGEA and UPW representatives "certified falsely" that requests for ported funds did not exceed the actual monthly cost of the coverage.

On September 15, 2006, the circuit court issued an order granting in part and denying in part the State's second motion for leave to file a second amended complaint. Specifically, the circuit court allowed the State to file a second amended complaint "consistent with" an attached version of the State's June 2006 second proposed second amended complaint as edited by the circuit court. The circuit court denied the State's motion "in all other respects." On the first page of the attached proposed second amended complaint was a handwritten note

stating: "Per Rule 12(f) HRCP[17] – Edited/stricken per minute order granting in part [Plaintiff's] second [motion] to file [second amended complaint]." The circuit court's edited version struck most of the factual allegations from the State's June 2006 proposed second amended complaint, including the allegations that HGEA, UPW, and VEBAH failed to cooperate with the audit; that the actual cost of providing coverage under HGEA's and UPW's plans were less than the ported amounts; that the defendants used ported funds to make improper payments; and that the defendants' requests for ported funds falsely certified that the amounts requested did not exceed the actual monthly cost of the coverage. The circuit court's edited version left intact the declaratory judgment claim.

Ten days later, on September 25, 2006, the State filed a motion for reconsideration of (1) the circuit court's June 2, 2006 order denying without prejudice the State's motion for leave to file a second amended complaint, and (2) the circuit court's September 15, 2006 order granting in part and denying in part the State's second motion for leave to file a second amended

---

[17]    HRCP Rule 12(f) (2000) provides:

> Motion to strike.  Upon motion made by a party before responding to a pleading or, if no responsive pleading is permitted by these rules, upon motion made by a party within 20 days after the service of the pleading upon the party or upon the court's own initiative at any time, the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter.

-24-

complaint. The circuit court denied the motion for reconsideration.

On November 20, 2006, the State filed a second amended complaint that eliminated the factual allegations that the circuit court struck in the court's September 15, 2006 order. The State's declaratory judgment claim sought a new definition of the phrase "actual monthly cost of the coverage"; that is, the proposed definition differed from that in the complaint approved by the circuit court in the court's September 15, 2006 order. The second amended complaint filed November 20, 2006 sought a declaratory judgment that the term "actual monthly cost of coverage," means "(1) premiums paid to insurance carriers in bona fide transactions at arm's length, less any refunds, rate credits, and reimbursements, or (2) allowable claims paid or incurred, plus reasonable administrative fees and profits, in transactions that are not bona fide and at arm's length." (Emphasis in original).

Royal State, UPW, and HGEA filed motions to strike the second amended complaint, arguing that the declaratory judgment claim in the second amended complaint was "distinctly different" from what the circuit court had approved. The circuit court granted the motions to strike the second amended complaint.[18]

---

[18]    The circuit court denied the motions to strike as to HGEA's, Royal State's, and UPW's request for an award of attorney's fees incurred in relation to the motion.

-25-

However, the circuit court ruled sua sponte that the State be granted leave to file a third amended complaint consistent with the circuit court's edited version that was attached to the court's September 15, 2006 order.

On April 5, 2007, the State filed the operative third amended complaint. The third amended complaint asserted a single claim for declaratory judgment, seeking a declaratory judgment that the term "actual monthly cost of [the] coverage," as used in HRS §§ 87-22.3, 87-22.5, and 87-23 means

> (1) premiums paid to insurance carriers in arm's length transactions, less any refunds, rate credits, and reimbursements, where the carrier is independent of HGEA and UPW, meaning, not controlled by, related to, or conspiring with leaders of HGEA and UPW to circumvent statutory limits on amounts ported by the Health Fund, or (2) allowable claims paid or incurred, plus reasonable administrative fees and profits where the carrier is not independent of HGEA and UPW.

Royal State, RSN, TRIA, VEBAH, and MAP (collectively, Royal State Group) moved to dismiss the complaint, arguing, inter alia, that any claim for excess porting belonged to the EUTF, and thus the state attorney general needed the authorization of the EUTF to bring the instant action. Royal State Group also argued that the county defendants were neither necessary nor proper parties. UPW and HGEA also filed motions to dismiss, adopting Royal State Group's arguments. The circuit court denied the motions to dismiss, except as to the counties, which were dismissed.

On August 14, 2007, the State filed a motion for summary judgment regarding the meaning of the phrase "actual monthly cost of the coverage" in HRS chapter 87. The State argued that "actual cost" means:

> the cost negotiated with insurers in a <u>bona fide</u> transaction at arm's length, which is:
>
> premiums paid to insurance carriers in arm's length transactions, less any refunds, rate credits, and reimbursements, where the carrier is independent of HGEA and UPW, meaning, not controlled by, related to, or conspiring with leaders of HGEA and UPW to circumvent statutory limits on amounts ported by the Health Fund.

The State further argued that where, in the case of HGEA and UPW, "the carriers were not independent, 'actual cost' means allowable claims paid or incurred, plus reasonable administrative fees and profits." The State argued that construing "actual cost" to mean premiums paid would "frustrate" the legislature's purpose "by allowing insiders to inflate premiums and then skim off windfall profits." The State argued that equating "actual cost" with "premiums" would render the word "actual" meaningless and that other Hawaiʻi statutes use the term "actual cost" to "avoid deceptive or unfair trade practices and misuse of public funds" and the term "usually refers to the fair market value of goods and services." The State also argued, inter alia, that a 1993 management review report of the Health Fund indicated the Health Fund understood "actual cost of coverage" included health benefits and reasonable administrative expenses but excluded surplus or experience gains, and that in a

1994 response to the report, HGEA and UPW leaders "did not disagree" with that understanding.

Royal State Group provided a lengthy response to these arguments in its opposition to the State's summary judgment motion, arguing, inter alia, that there was no admissible evidence that HGEA and UPW controlled, were related to, or conspired with any defendant, and that thus, "even under the statutory interpretation urged by the State, the 'actual monthly cost of [the] coverage' means the premiums paid to RSN and VEBAH[.]" Royal State Group also argued, inter alia, that there was no evidence that HGEA, UPW or their officers had any ownership interest in or obtained any payment from any defendant, that the opinions in the Biggs report were "incompetent, deliberately misleading and irrelevant," and that the statutory language and legislative history are contrary to the State's interpretation of "actual monthly cost of the coverage." Royal State Group further argued that the State's summary judgment motion mischaracterized the 1993 report regarding the Health Fund as well as the union's responses, and that the State's interpretation of "actual monthly cost of the coverage" was not supported by or conflicted with prior state Attorney General advisory opinions regarding the Health Fund.

HGEA and UPW adopted the arguments made in Royal State Group's opposition to the State's motion for summary judgment.

UPW further argued, inter alia, that the State failed to present any admissible evidence of HGEA or UPW's control over VEBAH, Royal State or Royal State entities, and that as such, the State's definition of "actual monthly cost of the coverage" as it related to HGEA and UPW controlling or conspiring with insurance carriers should be disregarded. UPW also argued that the legislative history did not support the State's definition of "actual monthly cost of the coverage." Finally, UPW argued that the Health Fund had understood "actual monthly cost of the coverage" to mean premiums. UPW pointed to a March 24, 1994 memorandum from the Health Fund administrator to "Executive Director, Employee Organization Plan," instructing the unions on the information required in submitting porting requests.[19] The memorandum provided, inter alia:

> 2.  On each schedule, enter the following
>     information by benefit plan and enrollment type
>     in the appropriate box:
>
>     A.  Name and Cost – enter plan name and
>         monthly premium for that benefit plan
>
>     B.  Port – enter the public employer
>         contribution amount requested

The form letter included with the memorandum, which was to be prepared on the union's stationery and returned to the Health Fund, stated:

> Gentlemen:

---

[19]    Royal State Group pointed to the same memorandum in its opposition to the State's motion for summary judgment.

> Re:  REQUEST FOR TRANSMITTAL OF FY 1994-95 EMPLOYER
>      CONTRIBUTIONS
>
> Effective July 1, 1994, please transmit or "port"
> monthly employer contributions to our employee
> organization plan in accordance with Sections 87-4,
> 87-22.3, 87-22.5 and 87-23, HRS, and our collective
> bargaining agreements.
>
> I certify that our Plan's requested contributions as
> shown on the attached Schedule(s) No. []_____ are the
> proper amounts to purchase benefits for our eligible
> members under Sections 87-4(a), (b), and (c) or the
> actual monthly cost of the coverage, whichever is
> less.

UPW argued that therefore, "in practice the [Health Fund] for years instructed the unions to provide schedules that stated 'the proper amounts to purchase benefits for their members . . . or the actual monthly cost of [the] coverage' which meant the premiums charged."

In reply, the State disputed, inter alia, the defendants' contention that there was a lack of admissible evidence, and stated that in any event, the issue to be resolved was the definition of "actual cost" rather than factual issues.

On July 9, 2009, the circuit court issued an Order Denying Plaintiffs' Motion for Summary Judgment and Granting Summary Judgment Against Plaintiffs.  The order stated, in relevant part, the following:

> 4.    . . . [T]he Court has before it, as admissible
>       evidence, prior Attorney General interpretations
>       of the law which referred to cost as the premium
>       and, among other things, the forms that the
>       Administrator of the [Health Fund] required the
>       Defendants to use to certify the cost every
>       year, indicating that the cost referred to the
>       premium;
> 5.    In addition, in interpreting a statute, the
>       Court must give meaning that appears clear from

the Legislative history and the language of the
statute itself, in a common sense approach;

6.      The Court finds and concludes that the Alleged
        Meaning asserted by Plaintiffs is NOT correct;

7.      Based upon Flint v. MacKenzie, 53 Haw. 672[, 501
        P.2d 357] (1972) and Cordero v. Burns, 7 Haw.
        App. 463[, 776 P.2d 411] ([] 1989), there being
        no genuine issue of material fact in this Rule
        56 HRCP motion to interpret statutory language,
        no good purpose would be served by requiring a
        cross motion for summary judgment and instead,
        in the interest of judicial economy, efficiency
        and integrity and consistency of ruling, the
        Court GRANTS summary judgment AGAINST Plaintiffs
        and in favor of all of the Defendants, that the
        term "actual monthly cost of [the] coverage" as
        used in HRS Sections 87-22.3, -22.5, and -23
        (repealed 2003) means the premium charged by and
        paid to the carrier.

The circuit court entered judgment against the State on

September 29, 2008.[20]

**C.   ICA Appeal**

On September 11, 2008, the State timely filed its

notice of appeal to the ICA.[21]  On appeal, the State raised five

points of error.  Relevant to the issues before this court, the

State argued that the circuit court erred when it interpreted the

term "actual monthly cost of the coverage" from HRS §§ 87-22.3,

87-22.5, and 87-23 to mean "the premium charged by and paid to

the carrier[.]"  The State asserted that the definition of

"actual monthly cost of the coverage" should "require an arm's-

length transaction and consideration of refunds, rate credits,

_____

[20]     Royal State Group, UPW, and HGEA sought attorney's fees, which the
circuit court denied.  The State moved to require Royal State Group and UPW to
pay Samuel Biggs reasonable fees for preparing and appearing at Biggs'
deposition.  The circuit court denied the State's motion.

[21]     Royal State Group cross-appealed, arguing that the circuit court
erred in denying them an award of attorney's fees and costs.  Fees and costs
are not at issue before this court.

and reimbursements, and reasonable administrative costs, in determining the actual cost of coverage."  The State also argued that the circuit court erred when it denied the State leave to file a second amended complaint and "rewrote" the State's complaint.

The ICA affirmed in part and vacated in part the circuit court's judgment.  Relevant to the issues before us, the ICA majority concluded that the circuit court did not err when it interpreted "actual monthly cost of the  coverage" to mean "the premium charged by and paid to the [insurance] carrier" for the union-sponsored coverage.  (Alteration in original).  The ICA majority first noted that there was no statutory definition of "actual cost of the coverage" in chapter 87, and thus relied on the dictionary definitions of "actual" as "[e]xisting in fact; real" and "cost" as "[t]he amount paid or charged for something; price or expenditure."  (Alterations in original).  The ICA majority also stated that "coverage" plainly referred to the insurance coverage provided to the state employee participating in the union's plan.  Although the ICA majority found no ambiguity in "actual cost of coverage," it looked to the legislative history of chapter 87 and stated that nothing in the legislative history "even remotely suggests that the Legislature intended a meaning other than the plain meaning of 'actual cost.'"  The ICA majority acknowledged the State's argument that

the premiums charged did not reflect the "actual value" of the coverage provided, but stated that "[a]lthough the State's money-saving goal is laudable, this court simply cannot rewrite the Health Fund statute in order to drive down the State's expense stemming from the union-sponsored coverage." The ICA majority also stated:

> The State is not alleging that the ported funds exceeded the cost of Health Fund-provided coverage. Nor is the State alleging that the ported funds exceeded the actual amounts that the unions paid to the insurance carriers. Instead, the State is suggesting that the unions paid too much for the coverage because of the close ties between the unions and the insurers. The State's theory of legal liability based on a violation of Chapter 87, however, is untethered from the plain language of the statutes and the State's suggested interpretation is unsupported by the legislative history, except for the general aspiration that the union-sponsored plans might be less expensive than the Health Fund-sponsored plans. Additional limitations, checks, and/or restraints certainly could have been written into the statute, but they were not.

The ICA majority further stated that in light of its rejection of the State's interpretation of the "actual cost of coverage," the issue of whether the circuit court erred when it denied the State leave to file a second amended complaint and "rewrote" the State's complaint was no longer justiciable. The ICA majority therefore affirmed the circuit court's judgment with respect to its interpretation of the term "actual monthly cost of the coverage," and declined to reach the issues raised with regard to the State's proposed second amended complaint.

In his concurring and dissenting opinion, Chief Judge Nakamura disagreed with the majority's interpretation of "actual

monthly cost of the coverage."  Judge Nakamura stated that the circuit court's interpretation that "actual monthly cost of coverage" meant "the premium charged by and paid to the carrier" was too restrictive because it did not allow for "the possibility that the premium charged and paid could be tainted by bad faith, collusion, or fraud."  Judge Nakamura stated that the circuit court's interpretation "should have been qualified by the proviso that 'actual monthly cost of coverage' means 'the premium charged by and paid to the carrier,' except if the premium charged was determined in bad faith or through fraud."  Judge Nakamura stated that the background and history of the Health Fund showed that the legislature intended to "provide public employees with health and life insurance benefits in a manner that was economical and cost-effective to both public employers and employees."  Judge Nakamura also stated that the legislative history of the Health Fund did not suggest a legislative intent that public funds be "wasted or spent to cover amounts determined fraudulently or in bad faith[,]" and that thus, interpreting the phrase "actual monthly cost of coverage" to mean "the premium charged by and paid to the carrier" without an exception for premiums charged and paid as a result of "bad faith, collusion, or fraud, would lead to an absurd and unjust result."

Judge Nakamura also noted that at the time the legislature adopted the phrase "actual monthly cost of coverage,"

Black's Law Dictionary defined "actual cost" to mean: "The actual price paid for goods by a party, <u>in the case of a real bona fide purchase</u>, which may not necessarily be the market value of the goods. <u>It is a general or descriptive term which may have varying meanings according to the circumstances in which it is used</u>." Black's Law Dictionary at 33 (5th ed. 1979) (emphases in original). Judge Nakamura further noted that the term "bona fide" was defined as "[i]n or with good faith; honestly, openly, and sincerely; without deceit or fraud." Id. at 160. Judge Nakamura stated that therefore, considering the above dictionary definitions and the purpose of the Health Fund statute, the circuit court's interpretation of "actual monthly cost of coverage" was too restrictive because it did not account for the possibility that the premium charged by and paid to the carrier could be the result of bad faith or fraud.

While expressing no opinion on the validity of the State's allegations, Judge Nakamura also concluded that the State should be permitted to amend its complaint "to pursue its allegations of fraud and to provide the proper context and background for evaluating the 'actual monthly cost of coverage' limitation and the State's claims for relief."[22]

_____

[22] In response to Judge Nakamura's dissent, the ICA majority stated that while it shared Judge Nakamura's concern that the legislature did not intend to pay for the cost of fraudulently set premiums, that was not an accurate or fair characterization of the issues before the ICA. The ICA majority noted that chapter 87 established limits on ported funds using the lesser of either the amount determined by collective bargaining, or the actual
(continued...)

The ICA entered its judgment on appeal on April 26, 2013.  The State timely filed an application for writ of certiorari.

### III.  Standards of Review

**A.   Statutory Interpretation**

"Statutory interpretation is a question of law reviewable de novo."  Kaleikini v. Yoshioka, 128 Hawaiʻi 53, 67, 283 P.3d 60, 74 (2012) (citation omitted).

**B.   Motion for Leave to Amend the Complaint**

"Orders denying motions for leave to amend a complaint are reviewed for an abuse of discretion."  Jou v. Dai-Tokyo Royal State Ins. Co., 116 Hawaiʻi 159, 163, 172 P.3d 471, 475 (2007) (citation omitted).

### IV.  Discussion

**A.   "Actual monthly cost of the coverage" means the premium charged by and paid to the insurance carrier**

The State argues that the ICA erred when it interpreted "actual monthly cost of the coverage" to mean the premium charged by and paid to the insurance carrier.  The State argues that "actual [monthly] cost of coverage" must be interpreted as a "bona fide transaction," or premiums paid in "arm's length

---

[22](...continued)
monthly cost of the coverage.  The ICA majority stated that "nothing in the statute or legislative history [] required [] unions to seek the hoped-for savings, or prohibited any particular level of fees and/or profit by the unions' insurers, or prohibited related-party transactions, or required 'bona fide negotiations,' bidding, or other procurement procedures."  (Emphases in original).

transactions, less any refunds, rate credits, and reimbursements, . . . plus reasonable administrative fees and profits[.]"  In other words, "actual monthly cost of the coverage" means "the real cost for the coverage, that is, the cost in a legitimate arm's-length business transaction."  The State contends that the ICA erred in two ways.  First, "the ICA acted as if the statute had used the word 'premium' and gave the phrase 'actual cost' no meaning."  Second, the State argues that the ICA's result is "illogical" because "[i]t is absurd to suggest that the price set by the purveyor of something always and necessarily reflects its actual value."  As set forth below, the ICA majority did not err.

It is well-established that the "fundamental starting point for statutory interpretation is the language of the statute itself."  State v. Wheeler, 121 Hawaiʻi 383, 390, 219 P.3d 1170, 1177 (2009) (quoting Citizens Against Reckless Dev. v. Zoning Bd. of Appeals of the City & County of Honolulu, 114 Hawaiʻi 184, 193, 159 P.3d 143, 152 (2007)).  "[W]here the statutory language is plain and unambiguous, our sole duty is to give effect to its plain and obvious meaning."  Id.  Moreover, "implicit in the task of statutory construction is our foremost obligation to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself."  Id.  "[A] rational, sensible and practicable interpretation of [a statute] is preferred to one which is

unreasonable or impracticable[.]"  Haw. Gov't Emps. Ass'n, AFSCME

Local 152, AFL-CIO v. Lingle, 124 Hawaiʻi 197, 207 n.16, 239 P.3d

1, 12 n.16 (2010) (citation omitted) (brackets in original).

As stated above, HRS § 87-22.3 required the Health Fund

to provide health benefits to public employees in the following

manner:

> (1)   For those employee-beneficiaries who are not
>        participating in a health benefits plan of an
>        employee organization . . . , the [Health Fund]
>        shall establish health benefits plans and the
>        requirements for eligibility under the health
>        benefits plans; or
>
> (2)   For employee-beneficiaries who participate in
>        the health benefits plan of an employee
>        organization, the [Health Fund] shall pay a
>        monthly contribution for each employee-
>        beneficiary, in the amount provided in section
>        87-4(a), or the actual monthly cost of the
>        coverage, whichever is less, towards the
>        purchase of health benefits under the health
>        benefits plan of an employee organization.

(Emphases added).

Similar language appeared in HRS § 87-22.5 (determining

dental plan benefits) and HRS § 87-23 (determining group life

benefits).  Under this statutory scheme, the Health Fund's

contribution ported to the union would be either (1) the public

employer's contribution for the cost of insurance, as determined

by the applicable collective bargaining agreement, see HRS § 87-

4;[23] or (2) the actual monthly cost of the coverage, whichever is less.

As a preliminary matter, HRS chapter 87 did not define "actual monthly cost of the coverage." However, "it is well-settled that, when a term is not statutorily defined, this court may resort to legal or other well accepted dictionaries as one way to determine its ordinary meaning." State v. Jing Hua Xiao, 123 Hawaiʻi 251, 259, 231 P.3d 968, 976 (2010); see also Gillan v. Gov't Employees Ins. Co., 119 Hawaiʻi 109, 115, 194 P.3d 1071, 1077 (2008). The word "actual" is defined in part as "existing in fact or reality" or "existing or occurring at the time[.]" Merriam-Webster's Collegiate Dictionary 13 (11th ed. 2009).

_____

[23]    HRS § 87-4 (1993) provided, in relevant part, that the State and the several counties pay to the Health Fund a monthly contribution equal to:

> (a) . . . the amount established under chapter 89C or specified in the applicable public sector collective bargaining agreement, whichever is appropriate, for each of their respective employee-beneficiaries and employee-beneficiaries with dependent-beneficiaries, which shall be used toward the payment of costs of a health benefits plan; provided that the monthly contribution shall not exceed the actual cost of a health benefits plan. . . .
> (b) . . . the amount established under chapter 89C or specified in the applicable public sector collective bargaining agreement, whichever is appropriate, for each child who has not attained the age of nineteen of all employee-beneficiaries who are enrolled for dental benefits. The contributions shall be used towards the payment of costs of dental benefits of a health benefits plan. . . .
> (c) . . . the amount established under chapter 89C or specified in the applicable public sector collective bargaining agreement, whichever is applicable, for each of their respective employees, to be used towards the payment of group life insurance benefits for each employee.

(Emphases added).

"Cost" is defined as "the amount or equivalent paid or charged for something; price[.]" Id. at 282. "Coverage" is defined in the insurance context as "inclusion within the scope of an insurance policy or protective plan[.]" Id. at 288. Accordingly, the foregoing ordinary meanings support the circuit court's and the ICA's interpretation; that is, that "actual monthly cost of the coverage" means the monthly premium that was in fact charged and paid for insurance.[24]

Moreover, the plain language of the statute is completely devoid of any of the restrictions or requirements regarding the monthly cost of coverage that the State advocates for, such as express limits on the reasonableness of profits or administrative expenses. As the ICA majority pointed out, the legislature could easily have written such express limitations, checks, and/or restraints into the Health Fund statutes. However, lawmakers did not do so.

Nonetheless, the State argues that the circuit court's interpretation is contrary to the legislature's intent, and that the legislative history of the phrase "actual monthly cost of the coverage" was meant to decrease the public employers' cost of providing insurance.

---

[24] This interpretation does not render the word "actual" superfluous. See dissenting opinion at 6. The word "actual" indicates that the ported amount constituted the cost that was, in fact, charged and paid for the insurance.

However, upon close inspection, the legislative history of the Health Fund and the statutory phrase "actual monthly cost of the coverage" does not support the State's interpretation. Rather, an examination of the relevant history of the Health Fund supports the view that the legislature intended for "actual monthly cost of the coverage" to mean the premium charged. Indeed, as set forth below, this interpretation is supported by viewing the statutory language "in the context of the entire statute and constru[ing] it in a manner consistent with its purpose." Lingle v. Haw. Gov't Emps. Ass'n, AFSCME, Local 152, AFL-CIO, 107 Hawaiʻi 178, 183, 111 P.3d 587, 592 (2005) (citation omitted).

The Health Fund was established in 1961 via Act 146 to provide employee-beneficiaries and dependents with a health benefits plan. 1961 Haw. Sess. Laws Act 146, § 1 at 191-92. As shown in Act 146 and subsequent amendments to the Health Fund law, the legislature had anticipated that the insurance policies would generate refunds. Indeed, Act 146 provided that the health trust fund "shall consist of contributions, interest, income, dividends, refunds, rate credits and other returns." Id. at 192 (emphasis added). The State's monthly contribution to the Health Fund was $3 for each employee-beneficiary and $10 for each employee with a dependent. Id. Each employee-beneficiary was to make a monthly contribution equal to the "difference between the

monthly charge of the health benefits plan selected by the employee-beneficiary and the State's contribution to the fund." Id. at 193.

In 1967, the Health Fund added group life insurance benefits. See 1967 Haw. Sess. Laws Act 110, § 3 at 101. This legislation, enacted as Act 110, also introduced the concept of porting, and began the porting program with respect to group life insurance. Id. Specifically, Act 110 provided that the Health Fund would provide group life insurance benefits to employees in the following manner:

> (a) For those employees who are not participating in a group life insurance program of an employee organization (hereafter "nonparticipating employees"), the board shall determine a group life insurance benefit plan and eligibility requirements for such benefits based upon the contribution of $2.25 per month per employee. Any rate credit or reimbursement from any carrier of any earnings or interest derived from the group life insurance plan of nonparticipating employees shall be used to improve the group life insurance benefits of nonparticipating employees.
> (b) For those employees who participate in a group life insurance program of an employee organization, the board shall allot $2.25 per month towards the purchase of group life insurance benefits under the group life insurance program of an employee organization, provided that no employee shall have more than one allotment of $2.25 per month.

Id. (emphases added).

In approving the above legislation, the Senate Ways and Means Committee explained that for employees not participating in union group life insurance programs, the Health Fund would "allot $2.25 each month for each employee towards the cost of employees' premiums." S. Stand. Comm. Rep. No. 922, in 1967 Senate Journal, at 1256 (emphasis added). Act 110 also required that "[a]ny rate

-42-

credit or reimbursement" from the insurance carrier for the Health Fund group life insurance plan be used to "improve the group life insurance benefits" of employees not participating in a union plan.  1967 Haw. Sess. Laws Act 110, § 3 at 101. Notably, although the above language demonstrates the legislature's awareness that refunds or reimbursements could be realized from certain insurance contracts, lawmakers did <u>not</u> insert any requirements or restrictions with regard to any refunds or reimbursements associated with union plans.

In 1970, the legislature amended chapter 87 to increase the State's contributions to the Health Fund, "provided, that the monthly contribution shall not exceed the <u>actual cost of a health benefits plan</u>."  1970 Haw. Sess. Laws Act 154, § 1 at 277 (emphasis added).  The legislative history of this measure contains several references to "premiums."  In passing this legislation, lawmakers noted that with raises in insurance rates, some employees were paying about "two thirds of the <u>premiums</u>[,]" a result that was contrary to the intent of the program, which began with the government and employees sharing the <u>premium cost</u> on a "50-50 basis[.]"  H. Stand. Comm. Rep. No. 661-70, in 1970 House Journal, at 1121 (emphasis added); S. Stand. Comm. Rep. No. 728-70, in 1970 Senate Journal, at 1322 (emphasis added).  Early drafts of the bill required the State to make monthly contributions equal to 50 percent of "the total <u>cost</u> of the

<u>premium</u>" for health plans, "provided that the State shall pay as its share . . . not more than 50 percent of the <u>premium</u> of the lowest available medical plan." S. Stand. Comm. Rep. No. 93-70, in 1970 Senate Journal, at 1054 (emphases added). Accordingly, the legislative history of the 1970 amendment suggests that the legislature equated the "cost" of a plan with the premiums charged for it.

The legislature first added the phrase at issue in the instant case – actual monthly cost of the coverage – to chapter 87 in 1980, with regard to children's dental benefits. This legislation, enacted as Act 61, introduced the concept that the porting amount for certain plans would equal the lesser of either the collectively bargained-for amount or the actual monthly cost of the coverage. See 1980 Haw. Sess. Laws Act 61, § 1 at 77.

The State relied heavily on the legislative history of Act 61 in its opening brief. Specifically, the State argued that the legislative history demonstrates that the "'actual [monthly] cost of coverage' limitation on the amount of ported funds was intended to lower the cost of providing insurance." (Emphasis in original). However, upon close examination, the legislative history of the phrase "actual monthly cost of the coverage" suggests that the legislature had several purposes in mind and that its cost savings considerations were more modest than the State suggests.

The purpose of Act 61 was to allow the Health Fund to port funds for children's dental benefits to a union plan.  See H. Stand. Comm. Rep. No. 463, in 1979 House Journal, at 1359; H. Stand. Comm. Rep. No. 195, in 1979 House Journal, at 1233; S. Stand. Comm. Rep. No. 893-80, in 1980 Senate Journal, at 1448. Specifically, Act 61 required the Health Fund to provide dental plan benefits to employees' children in the following manner, in relevant part:

> (1)   For those children of employees who are not participating in a dental program of an employee organization (hereafter called "nonparticipating employees"), the [Health Fund] shall determine a dental plan and eligibility requirements for such benefits based upon a statutory monthly contribution per enrolled child.  <u>Any rate credit or reimbursement from any carrier of any earnings or interest derived from the dental plan of nonparticipating employees shall be used to improve the dental plan benefits of nonparticipating employees.</u>[25]
> (2)   For those children of employees who participate in the dental program of an employee organization, the [Health Fund] shall allot the <u>statutory monthly contribution per enrolled child or the actual monthly cost of the child's coverage, whichever is less</u>, towards the purchase of dental plan benefits under the dental program of an employee organization; provided that no enrolled child shall have more than one allotment a month.

---

[25]   In 1997, the legislature deleted provisions requiring that rate credits or reimbursements with regard to Health Fund children's dental plans and life insurance plans be used to improve the benefits of such plans. 1997 Haw. Sess. Laws Act 276, §§ 3-4, at 610-11.  The legislature instead provided that rate credits or reimbursements from carriers or self-insured plans may be used to "stabilize health benefits plan or long-term care benefits plan rates[.]"  <u>Id.</u> § 1, at 609.  The legislature further provided that any rate credits or reimbursements in excess of funds used to stabilize such plans must be returned to the State or county if the moneys are returned from, inter alia, a plan that provides health benefits to employees, so long as "the amount returned to the general fund shall be only that portion financed by the State or by the county on behalf of the employee."  <u>Id.</u> § 1, at 609-10.

Id. (emphases added).

The Senate Ways and Means Committee expressly stated that the purpose of the bill was "to allow the public employees' health fund to transmit employer contributions for a public employee's child . . . to the dental plan of an employee organization if the employee participates in the employee organization's dental plan."  S. Stand. Comm. Rep. No. 893-80, in 1980 Senate Journal, at 1448.  This was necessary because the Health Fund at that time provided dental benefits to children of public employees, but not to public employees themselves, which prompted some unions to offer dental plans for their employee members.  Id.  As a result, employees and their children had separate dental plans.  The Senate Ways and Means Committee stated that authorizing the porting of "employers' statutory contributions for children to the dental plan of their employee-parents" would facilitate both employee-parents and their children to be covered by the same dental plan.  Id.

The Senate Ways and Means Committee report then stated that the legislation "may also have the effect of lowering employer contributions."  Id. (emphasis added).  The committee noted that the legislation provided that,

> the contributions to the employee organizations' dental plans must be the lesser of the statutory contribution amount or the actual cost.  If the actual cost is lower than the statutory amount, the employer contributions will be lower.  The bill provides that employer contributions cannot exceed the statutory amount even if the actual cost is higher.

-46-

Id.

The committee further noted testimony from, inter alia, the Health Fund board that "this method of distributing employer contributions for dental benefits is similar to the method presently used under the fund's group life insurance plan." Id. At the time, the Health Fund was required to port to the unions $2.25 a month – the public employers' monthly contribution – for employees participating in a union life insurance plan. HRS § 87-23 (1985).

The committee also noted testimony from one employee union that "employer contributions may in fact be reduced if a family dental plan, instead of an exclusively parent plan, could be organized." S. Stand. Comm. Rep. No. 893-80, in 1980 Senate Journal, at 1448. Ultimately, the committee found the legislation "favorable" because: (1) it may be "economically beneficial to public employees"; (2) it does not significantly impact upon the Health Fund's operations; and (3) "[i]t does not require additional employer contributions and may potentially decrease employer contributions." Id. (emphases added).

According to the State, the Senate Ways and Means Committee report "shows that the Legislature clearly contemplated an 'actual cost' that was less than [the] amount for porting set by statute — an impossibility if the 'actual cost' is deemed to always equal a premium set to match the porting amount." This

reasoning, however, is flawed. First, as stated above, the committee reports, including that of the Senate Ways and Means Committee, demonstrate that the primary purpose of the portability concept in Act 61 was not to reduce employer contributions, but to allow employees and their children to be covered under the same plan. See, e.g., S. Stand. Comm. Report No. 893-80, in 1980 Senate Journal, at 1448. The potential reduction in employer contributions was considered a secondary, possible result. See id. ("The bill may also have the effect of lowering employer contributions. . . . [I]t does not require additional employer contributions and may potentially decrease employer contributions." (emphases added)). Second, the Senate Ways and Means Committee report contemplated not only that the actual monthly cost of the coverage could be lower than the statutory amount, but that the actual monthly cost could in fact be higher than the employer contribution. Id. ("The bill provides that the employer contribution cannot exceed the statutory amount even if the actual cost is higher." (emphasis added)). Indeed, the statute provided that the ported amount would equal the lesser of the statutory employer contribution or the "actual monthly cost of the child's coverage[.]" 1980 Haw. Sess. Laws Act 61, § 1, at 77.

The State also quoted a House Public Employment and Government Operations Committee report supporting the above

legislation as stating that "providing the ported funds would allow employees to access children's dental coverage 'at a much lower cost than would otherwise be possible.'"[26]  (Citing H. Stand. Comm. Rep. No. 195, in 1979 House Journal, at 1233).  This language in the committee report, however, does not support the State's position because it does not relate to the "actual monthly cost of the coverage," but rather refers to the anticipated effect that the ported employer contribution would have on a potential family dental plan.  Indeed, the committee report, read in its proper context, does not support the State's interpretation and in fact includes a reference to premiums:

> Your Committee finds that the aforesaid proposal will make available through the unions a family dental plan at a reasonable cost.  Since the premium relating to the children's portion will be contributed by the employer, insurance companies will be willing to offer a lower rate, thereby providing employees with a single plan at a much lower cost than would otherwise be possible.

H. Stand. Comm. Rep. No. 195, in 1979 House Journal, at 1233 (emphasis added).

The legislative history of other provisions in chapter 87 that employed the phrase "actual monthly cost of the coverage" also does not support the State's position.  Specifically, the history of subsequent legislation adding "actual monthly cost of

---

[26]  The State also relies on language from legislative committee reports stating that the foregoing legislation would have "no significant impact in terms of cost or program operations . . . as the amount of dental contributions is limited by statute."  (Citing H. Stand. Comm. Rep. No. 463, in 1979 House Journal, at 1359).  This language, however, is unpersuasive.  Indeed, nothing in this language indicates that dental contributions would decrease; rather, Health Fund officials expected "no significant" change.

the coverage" language elsewhere in chapter 87 does not suggest that the legislature intended a meaning other than the monthly premiums paid for such coverage. In 1984, the legislature incorporated similar "actual monthly cost of the coverage" language into legislation that established porting for health benefits plans.[27] 1984 Haw. Sess. Laws. Act 71, § 1 at 123. The House Finance Committee stated that the purpose of that legislation was to authorize the Health Fund to port monthly contributions "towards the purchase of health benefits" under union plans. H. Stand. Comm. Rep. No. 734-84, in 1984 House Journal, at 1224. The legislative history does not indicate that the purpose of the legislation was to reduce employer contributions; rather, the legislature's intent appeared to focus

_____

[27]    Specifically, Act 71 required the Health Fund to provide health benefits to employees in following manner:

> (1)    For [employees not participating in a union health benefits plan], the [Health Fund] shall establish health benefits plans and the requirements for eligibility under the health benefits plans. Any rate credit or reimbursement from any carrier of any earnings or interest derived from the health benefits plans of nonparticipating employee-beneficiaries shall be used to improve the respective health benefits plans of nonparticipating employee-beneficiaries or to reduce the employee-beneficiary's respective share of monthly contributions to a health plan.
>
> (2)    For [employees participating in a union health benefits plan], the [Health Fund] shall pay a monthly contribution for each employee-beneficiary, in the amount provided in section 87-4(a), or the actual monthly cost of the coverage, whichever is less, towards the purchase of health benefits under the [union] health benefits plan[.]

1984 Haw. Sess. Laws. Act 71, § 1 at 123 (emphases added).

on providing public employees a variety of health benefits plans to choose from. See, e.g., id. (concurring with "the intent of this bill to allow employee[-]beneficiaries a choice of health benefit plans, other than those sponsored by the . . . Health Fund, to meet their medical care needs"); S. Stand. Comm. Rep. No. 352-84, in 1984 Senate Journal, at 1150 ("Your Committee finds that this bill will expand the options of employee-beneficiaries by making available a wider variety of health benefits plans. Your Committee considers the expansion good public policy.").

Finally, in 1987, the legislature incorporated the "actual monthly cost of the coverage" language to the existing life insurance plan porting program. 1987 Haw. Sess. Laws Act 32, § 1 at 49. Act 32 deleted the specific dollar figure of $2.25 for the employer contributions for life insurance plans, and instead provided that employer contributions for employees participating in union plans total the collective bargained amount "or the actual monthly cost of the coverage, whichever is less[.]"[28] Id.

_____

[28] Specifically, Act 32 required the Health Fund to provide group life insurance to employees in the following manner:

> (1) For those employees [not participating in a union group life plan], the [Health Fund] shall determine a group life insurance benefit plan and eligibility requirements for such benefits based upon the based upon the amount to be contributed per employee under section 87-4(c). Any rate credit or reimbursement from any carrier of any earnings or interest derived from

(continued...)

Again, the legislative history does not reflect an understanding by lawmakers that "actual monthly cost of the coverage" meant anything other than premiums.  Rather, the purpose of Act 32 was to "conform the language pertaining to group life insurance benefits . . . to other sections on employee benefit plans governing" health benefits and dental plan benefits.[29]  See H. Stand. Comm. Rep. No. 1163, in 1987 House Journal, at 1655; S. Stand. Comm. Rep. No. 386, in 1987 Senate Journal, at 1050.

Accordingly, contrary to the State's contention, the legislative history of the phrase "actual monthly cost of the coverage" does not suggest that the legislature intended a

_____

[28](...continued)

> the group life insurance plan of nonparticipating employees shall be used to improve the group life insurance benefits of nonparticipating employees.
> (2)  For those employees [participating in a union group life insurance plan], the [Health Fund] shall pay a monthly contribution for each employee, in the amount determined under section 87-4(c), or the actual monthly cost of the coverage, whichever is less, towards the purchase of the group life insurance benefits under [the union plan].

Id. (emphases added).

[29]     The House Finance Committee noted that eliminating the fixed-dollar contribution amounts

> enables the Board to purchase group life insurance under a pooled concept for basic benefits and a supplemental plan for excess benefits as may be required by future collective bargaining negotiations. By providing the Board with greater flexibility, this bill will facilitate the more efficient administration of group life insurance programs for public employees.

H. Stand. Comm. Rep. No. 1163, in 1987 House Journal, at 1655.

meaning other than the monthly insurance premium.  Although the legislature hoped that savings would result if the union plans were priced lower than the Health Fund's plans, it did not mandate that result or include provisions requiring the unions and insurers to achieve it.

As stated above, the State essentially contends that "actual monthly cost of the coverage" was meant to be a restriction on the profits and administrative expenses of the insurers that provided the coverage.  However, such a reading is not supported by the plain language of the statute or the legislative history, which this court is bound to follow.  As the ICA majority noted, the legislature could have written express restrictions, qualifiers and/or limitations in chapter 87, but did not do so.  For example, the legislature could have defined "actual monthly cost of the coverage" as excluding a certain level of profits and administrative fees of insurers.  However, the legislature did not.  Moreover, the language of the statutes in chapter 87 demonstrates an awareness by the legislature that certain types of insurance plans could generate rebates and reimbursements, see, e.g., 1980 Haw. Sess. Laws Act 61, § 1 at 77, but the legislature chose not to require their return with respect to the union plans.

This court has stated that

> [w]e cannot change the language of the statute, supply a want, or enlarge upon it in order to make it suit a certain state of facts.  We do not legislate or make

> laws. Even when the court is convinced in its own
> mind that the [l]egislature really meant and intended
> something not expressed by the phraseology of the
> [a]ct, it has no authority to depart from the plain
> meaning of the language used.

State v. Klie, 116 Hawaiʻi 519, 525, 174 P.3d 358, 364 (2007) (brackets in original) (quoting State v. Sakamoto, 101 Hawaiʻi 409, 413, 70 P.3d 635, 639 (2003)); Ross v. Stouffer Hotel Co. Ltd., 76 Hawaiʻi 454, 467, 879 P.2d 1037, 1050 (1994) (Klein, J., concurring and dissenting) ("[W]e are not at liberty to interpret a statutory provision to further a policy that is not articulated in either the language of the statute or the relevant legislative history, even if we believe that such an interpretation would produce a more beneficent result, for '[t]he Court's function in the application and interpretation of such laws must be carefully limited to avoid encroaching on the power of [the legislature] to determine policies and make laws to carry them out.'" (brackets in original) (citation omitted)). Accordingly, the State's proposed interpretation fails.

Moreover, adopting the State's interpretation would lead to illogical results. The statutory language at issue is "actual monthly cost of the coverage" rather than simply "actual cost of coverage."[30] See HRS § 87-22.3. The inclusion of the word "monthly" supports the understanding that the legislature intended "actual monthly cost of the coverage" to mean premiums

---

[30] The State's arguments largely appear to use the phrase "actual cost of coverage" rather than "actual monthly cost of the coverage."

charged.  Indeed, it would appear illogical to apply the State's definition – for example, allowing for "reasonable administrative fees and profits" – on a monthly basis, since the amount of such items may not be known until the completion of the relevant fiscal year.[31]

We recognize that the State has raised serious and troubling allegations regarding improper financial dealings amongst the defendants.  However, the State chose to tie its allegations to the statutes, and conceded at oral argument that its claims, including conspiracy to defraud the State, depended entirely on its interpretation of the statutory phrase "actual monthly cost of the coverage."[32]  If, as the State suggests, the defendants conspired to charge inflated premiums in order to make improper payments to individuals, these facts could constitute a

---

[31]     Moreover, the State's reliance on case law for the proposition that the phrase "actual cost" does not mean "premium" in the insurance context also fails.  For example, the State cited United States v. Am. Bar Endowment, 477 U.S. 105, 108 (1986), for the proposition that "if, as is uniformly true, the insurance company's actual cost of providing insurance to the group is lower than the premium paid in a given year, the insurance company pays a refund of the excess[.]"  However, this reasoning is unpersuasive insofar as the "actual cost" in the aforementioned case refers to the insurer's cost of providing insurance.  In the instant case, however, the statutory phrase at issue – "actual monthly cost of the coverage" – contemplates the cost to the policyholder, not the insurer.  Additionally, the case law the State relied on, such as American Bar Endowment, describes so-called "experience-rated" insurance contracts, in which "the cost of insurance to the group is based on that group's claims experience, rather than general actuarial tables."  Am. Bar Endowment, 477 U.S. at 107-08.  It is undisputed that the supplemental plans at issue in the instant case are not experience-rated.

[32]     Moreover, at oral argument, the State was unwilling to confirm that there was a good faith basis for the allegations in the complaint that might support a common law fraud claim.

claim for conspiracy to defraud, irrespective of the statutory definition of "actual monthly cost of the coverage."[33]

However, that is not the theory that the State chose to pursue here, and we cannot rewrite the State's complaint to allege causes of action the State did not assert. The sole question here, as framed by the State, is a narrow one: do such allegations constitute a violation of the provisions of chapter 87? The answer to that question is no.

Chapter 87 limited the porting of funds to the lesser of either the cost of Health Fund-provided coverage pursuant to collective bargaining agreements, or the "actual monthly cost" of the coverage under the union benefits plans. The State has not alleged that the ported funds exceeded this statutory limit. Rather, the State's allegations hinge on the suggestion that the unions paid too much for the insurance coverage. However, neither the statutory language nor legislative history suggested that the union plans were required to result in cost savings, or that a certain amount of administrative fees or profits were prohibited. Again, the legislature was free to impose restrictions or limits addressing the issues that the State complains of, but such restraints and requirements were not

---

[33] A claim for fraud involves "a knowing misrepresentation of the truth or concealment of a material fact to induce another to act to his or her detriment." Fisher v. Grove Farm Co., Inc., 123 Hawaiʻi 82, 116, 230 P.3d 382, 416 (2009). Conspiracy to defraud requires a concerted action to defraud by two or more persons or entities. Id.

written into the statutes, and the legislative history does not reflect an intent to impose them.  Indeed, the proper remedy with respect to the State's concerns about the implementation of chapter 87 was legislative action, which ultimately occurred in 2001 with the repeal of the Health Fund.  See 2001 Haw. Sess. Laws Act 88, § 3, at 150.

Finally, we note that the dissent's position that the phrase "actual monthly cost of the coverage" must be interpreted as a prohibition against fraud is divorced from both the context in which the porting program arose and the procedural posture of this case.  The dissent thereby constructs an argument that chapter 87 was designed to be an enforcement mechanism by which the State could police the relationships between employee organizations and insurers.

However, as explained in detail above, both the plain language of the statute and its legislative history support the view that the legislature intended the phrase "actual monthly cost of the coverage" to mean the premium charged by and paid to the insurer.  Certainly, the legislature would not have intended for the porting program to "embrace" fraud, collusion, embezzlement or bad faith.  See dissenting opinion at 7-9.  At the same time, nothing in chapter 87 or its legislative history indicates this statute was intended to punish any such abuses by allowing the State to recover funds that were actually paid by

the unions for employee health benefits plans, but which the State retrospectively viewed as excessive.  Instead, the legislature imposed reasonable cost control measures by limiting the ported amount to the actual monthly cost of coverage or the amount negotiated through collective bargaining, whichever was less.  HRS § 87-22.3.  Additionally, the legislature presumably assumed that other remedies -- such as a common law fraud claim or criminal prosecution -- would deter further abuse.  It is a cardinal canon of statutory interpretation that "this court cannot change the language of the statute, supply a want, or enlarge upon it in order to make it suit a certain state of facts.  This is because we do not legislate or make laws." State v. Smith, 103 Hawaiʻi 228, 233, 81 P.3d 408, 413 (2003) (internal quotation marks and citations omitted).  Thus, it is not for this court to incorporate into HRS chapter 87 a prohibition against fraud, collusion, embezzlement or bad faith that does not otherwise exist.

Similarly, the dissent's reliance on HAR § 6-34-9 is misplaced.  Dissenting opinion at 9-11.  That provision required the unions to "[m]aintain reasonable accounting and enrollment records," and to "[p]ermit representatives of the board and the state comptroller to audit and examine its records that pertain to its health benefits plan."  HAR §§ 6-34-9(3)(A)-(B).  The focus on "reasonable accounting and enrollment records" indicates

that the Health Fund board was primarily concerned with whether the ported funds were actually used to enroll employees in benefits plans.  Additionally, although this provision allowed the board to audit the <u>union's</u> records, it made no mention of the board's ability to audit the <u>insurer's</u> records to determine whether the "actual monthly cost of the coverage" was excessive, or fraudulently or collusively set.

Additionally, article VII, section 4 of the Hawaiʻi Constitution does not support the dissent's conclusion.  <u>See</u> dissenting opinion at 11-13.  Article VII, section 4 provides: "No tax shall be levied or appropriation of public money or property made, nor shall the public credit be used, directly or indirectly, except for a public purpose. . . . No grant of public money or property shall be made except pursuant to standards provided by law."  Respectfully, there are no allegations in the instant case that the porting program did not serve a public purpose, or that the legislature's funding of that program did not comply with standards provided by law.  Additionally, allowing the government to recover from the unions and the insurers on the ground that the porting expenditures ultimately did not serve a "public purpose" would indicate that the State is entitled to recover funds any time it concludes, post hoc, that an expenditure was ill conceived or did not achieve its intended goal of serving the public.

Finally, we note again that, at oral argument, the State was unable to articulate a cause of action for fraud independent of its proffered interpretation of the phrase "actual monthly cost of the coverage" or to confirm that there was a good faith basis for the factual allegations of fraud contained in its complaint.

Based on the foregoing, we conclude that the circuit court did not err in interpreting "actual monthly cost of the coverage" to mean the premium charged by the carrier.

**B.    Leave to Amend**

The State argues that the circuit court abused its discretion by denying the State leave to file its second amended complaint and by essentially "rewrit[ing]" the State's complaint. Specifically, the State contends that this abuse of discretion occurred over the course of four developments in the proceedings, namely, when the circuit court

> (1) denied leave to file the second amended complaint
> even though leave had been granted earlier to file a
> broader complaint premised on the same central
> allegations, (2) read the particularity requirement
> incorrectly in HRCP [Rule] 9, (3) misused HRCP [Rule]
> 12(f) to rewrite the State's complaint itself, and (4)
> refused to allow the State to align its definition of
> "actual cost of coverage" with the amendments the
> court made to the complaint.

(Emphasis in original).

Royal State Group, on the other hand, argues that the circuit court acted within its discretion and that the court's orders throughout the litigation were a result of "persistent bad

faith" by the State.  Royal State Group also stated that even if the circuit court abused its discretion, any errors would be harmless because the issue in the instant case was the interpretation of the statutes.

As stated above, on January 18, 2006, the State sought leave to file a second amended complaint.  The proposed January 2006 second amended complaint asserted ten causes of action, including conspiracy to defraud the State, interference with contract, assumpsit, false claims, restitution and constructive trust, equitable accounting, specific performance, injunction, unjust enrichment, and breach of fiduciary duty.  On June 2, 2006, the circuit court denied without prejudice the State's motion for leave to file the second amended complaint. Specifically, the circuit court's June 2, 2006 order (1) denied the motion without prejudice as to the proposed conspiracy to defraud the State claim on grounds that it failed to comply with HRCP Rule 9(b); (2) allowed the State to amend its complaint to seek a declaratory ruling regarding the meaning of "actual monthly cost of the coverage"; and (3) stated that if the State seeks a declaratory ruling, and the circuit court ruled "consistent with the theory underlying the proposed Second Amended Complaint," the State may further seek leave to amend to assert its remaining claims.

Even assuming, arguendo, that the circuit court's rulings with regard to amendment of the pleadings constituted an abuse of discretion, the State cannot show that it was prejudiced as a result. Specifically, the State concedes that its remaining causes of action in its proposed second amended complaint would not have survived the circuit court's declaratory judgment ruling.[34] Indeed, the State has not identified any of its claims as being viable independent from the statutory interpretation issue, nor has the State urged this court to remand any of its remaining claims even in the event that the circuit court's statutory interpretation is upheld.

Therefore, in light of our affirming the circuit court's interpretation of "actual monthly cost of the coverage," we do not address the State's second question presented.[35]

### V. Conclusion

In sum, the circuit court did not err in interpreting the term "actual monthly cost of the coverage," as it appeared in HRS §§ 87-22.3, 87-22.5, and 87-23, to mean "the premium charged

---

[34] The State acknowledged during oral argument that the claims in its proposed second amended complaint were based on the interpretation of actual monthly cost of the coverage and further stated: "[T]he ICA ruled that if the State lost on the statutory interpretation issue that the leave to amend is moot, and we agree with that statement." Oral Argument, Hawaiʻi Supreme Court, at 1:00:32-1:01:21 (Oct. 17, 2013), available at http://www.courts.state.hi.us/courts/oral_arguments/archive/oasc29352.html.

[35] We note that in declining to address the State's argument, we are not expressing any opinion as to the merits of the State's allegations. However, as stated above, the State chose to tether its causes of action to the statutory language "actual monthly cost of the coverage" as it appeared in Chapter 87. Thus, as the State concedes, in light of our interpretation, the issue of whether the State should have be granted leave to amend is moot.

by and paid to the carrier."  Accordingly, the judgment of the ICA is affirmed.

Deirdre Marie-Iha
for petitioner

Paul A. Schraff
for Royal respondent

Charles A. Price
for respondent HGEA

Adrian W. Rosehill
for respondent UPW

/s/ Mark E. Recktenwald

/s/ Simeon R. Acoba, Jr.

/s/ Sabrina S. McKenna

